809 P.2d 455

**STATE of Idaho, Plaintiff–Respondent**

v.

**Paul Ezra RHOADES,
Defendant–Appellant.**

**No. 17527.**

Supreme Court of Idaho,
Boise, May 1990 Term.

Feb. 1, 1991.

Rehearing Denied March 28, 1991.

Radin & Webb, Idaho Falls, for appellant. Russell E. Webb, argued.

Jim Jones, Atty. Gen., and Lynn E. Thomas, argued, Boise, for respondent.

McDEVITT, Justice.

This case arises from the murder of Nolan Haddon, a convenience store clerk, during the course of a robbery. Paul Ezra Rhoades was charged with that murder, and after pretrial proceedings he entered a conditional guilty plea to second degree murder and robbery. The trial court accepted the plea agreement and sentenced Rhoades to an indeterminate life sentence for murder in the second degree, and an indeterminate life sentence for robbery.

By the terms of the plea agreement, Rhoades reserved for appeal the issues discussed below, except that the issue of prosecutorial misconduct in withholding exculpatory evidence from the defense was not listed as an issue preserved for appeal by the plea agreement.

The specific issues raised in this appeal are as follows:

I. Whether the trial court's failure to make a pre-trial ruling on the constitutionality of the statutory abolition of the insanity defense was error.

II. Whether the legislative abolition of the defense of mental condition in criminal cases violates the Idaho or United States Constitutions.

III. Whether inculpatory statements allegedly made by Rhoades to the police should have been suppressed as violative of *Miranda v. Arizona;* pursuant to enhanced requirements of reliability in capital prosecutions; or due to the failure of the police to tape record the alleged statements of the defendant.

IV. Whether the trial court should have excluded testimony by two jail house informants.

V. Whether the trial judge should have disqualified himself for prejudice in the Haddon case after imposing a death sentence upon the same defendant in another separately tried murder case.

VI. Whether the prosecution's failure to turn over to defendant exculpatory evidence constituted a denial of due process.

VII. Whether the trial court's approval of the prosecutor's method of charging weapons enhancements was erroneous.

### I.–II.

### PRETRIAL RULING ON AVAILABILITY OF INSANITY DEFENSE

■ In 1982, the Idaho Legislature revised the criminal code to abolish the insan-

ity defense in criminal cases, repealing I.C. § 18–209 ("[m]ental disease or defect excluding responsibility is an affirmative defense") and enacting new language in § 18–207(a) to provide that "[m]ental condition shall not be a defense to criminal conduct." *See* Idaho Sess. Laws, ch. 368, §§ 1 and 2 (1982).

In a pretrial motion, defense counsel requested a ruling from the trial court on the constitutionality of the legislative repeal of the insanity defense. It was urged that the abolition of the defense deprives criminal defendants of due process rights under the state and federal constitutions.

Both parties extensively briefed and argued the issue of justiciability; that is, whether there was any factual showing on the record which would grant the court the authority to render a ruling in the nature of a declaratory judgment on the issue. Rhoades had been examined by a court appointed psychiatrist pursuant to defense counsel's request. However, the defense did not introduce evidence indicating the psychiatrist's conclusions as to whether there was any basis on which to raise the issue of mental defect.

In opposition to the motion, the prosecution argued that the absolute absence of evidence on Rhoades's mental condition made the issue a non-justiciable controversy upon which the court had no jurisdiction to rule.

The defense countered that no showing was required under the unique circumstances. The defense asserted that the court did have jurisdiction to render a declaratory judgment, arguing that the nature of a declaratory judgment is to clarify legal uncertainty, and that having no legal definition of insanity then existing in the criminal law of Idaho made it impossible for a psychiatrist to render an opinion on whether Rhoades was legally insane. Thus, the defense requested the court to rule on whether the insanity defense would be available, and if so, which of the several legal definitions of insanity would be utilized in the case. The defense asserted that only then, in the context of a defined legal standard to be used at trial, would it

become possible for a psychiatrist to give a meaningful opinion on the criminal responsibility of the defendant.

The defense further argued that even if some showing was required under other circumstances, the prosecution and the court had waived the necessity of presenting preliminary evidence on Rhoades's mental condition when a defense request for psychiatric assistance at state expense was granted without the preliminary showing required by statute. The defense argues that the circumstances constitute a waiver of any showing that might be required in the later request for a ruling on the availability of the insanity defense.

Finally, the defense argued that there was a sufficient factual showing on the record to bring Rhoades's sanity into issue. Noting that where the insanity defense is permitted it may be established by lay testimony, the defense cited the preliminary hearing testimony of one of the arresting officers to the effect that on the night Rhoades was arrested he was unstable and incoherent.

The trial court denied the defense request for a ruling on the constitutionality of Idaho's abolition of the insanity defense, holding that the issue was a non-justiciable controversy. The issue before us is whether the trial court erred in determining that the question was not justiciable. We hold that the trial court was within the bounds of its authority in declining to rule on the defense motion.

■ The authority to render a declaratory judgment is bestowed by statute. The Declaratory Judgment Act, contained in Idaho Code tit. 10, ch. 12, confers jurisdiction upon the courts the option to "declare rights, status, and other legal relations, whether or not further relief is or could be claimed." I.C. § 10–1201. An important limitation upon this jurisdiction is that, "a declaratory judgment can only be rendered in a case where an actual or justiciable controversy exists." *Harris v. Cassia County,* 106 Idaho 513, 516, 681 P.2d 988, 991 (1984). This concept precludes courts from deciding cases which are purely hypothetical or advisory.

Declaratory judgments by their very nature ride a fine line between purely hypothetical or academic questions and actually justiciable cases. Many courts have noted that the test of justiciability is not susceptible of any mechanistic formulation, but must be grappled with according to the specific facts of each case. *Id.;* 22 Am. Jur.2d Declaratory Judgments § 33, at 697. This Court, in *Harris*, adopted the following language from the United States Supreme Court's definition of justiciability as a guiding standard in the context of declaratory judgment actions:

[A] controversy in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages.

*Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241–42, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted).

The same principle as pronounced by this Court provides:

The Declaratory Judgment Act ... contemplates some specific adversary question or contention based on an existing state of facts, out of which the alleged "rights, status and other legal relations" arise, upon which the court may predicate a judgment "either affirmative or negative in form and effect."

. . . .

The questioned "right" or status" may invoke either remedial or preventative relief; it may relate to a right that has either been breached or is only yet in dispute or a status undisturbed but threatened or endangered; but in either or any event, it must involve actual and existing facts.

*State v. State Bd. of Educ.,* 56 Idaho 210, 217, 52 P.2d 141, 144 (1935).

In this case, at the time of the motion for a ruling on the availability of the insanity defense, Rhoades had been examined by a psychiatric expert pursuant to a defense request. That particular expert was imported for this case from Colorado, specially requested by the defense due to his expertise in mental condition relating to criminal law and the effect of drugs in the context of diminished capacity.

During hearing on the motion, the trial court asked defense counsel whether the expert had expressed any opinion on Rhoades's ability to understand the nature of his acts or form a criminal intent. Defense counsel responded that it would be impossible to obtain any opinion on the matter unless and until the court provided a legal definition of insanity for the expert to work with.

We perceive the difficulty of the defense in obtaining an expert opinion on such a complex issue without the guiding framework of a legal standard. We also recognize that a psychiatric opinion on the mental condition of a defendant in a criminal case is forged by a long process of interaction between the expert and the defense, and that the final result of that process will not generally be available in a refined form during the pretrial stage of a criminal case.

However, the trial court did not require that the defense present an expert opinion as to the ultimate issue of Rhoades's sanity. The court requested any expression of opinion by the expert as to whether insanity might be an issue in the case, or an assertion by counsel that he was raising the defense of insanity. The court did not require actual testimony concerning exact mental processes or precise cognitive abilities of the defendant. It would have suf-

ficed for the expert to provide a summary affidavit stating that in his opinion there was a viable issue of insanity involved in the case. Alternatively, the expert might have submitted an affidavit to the effect that it would be impossible for him to render an opinion without a guiding legal standard. Yet another option might be to offer an opinion based on the definition of insanity that Idaho had in place prior to the legislative repeal of the defense, restricting the affidavit to an *in camera* review in order to protect the defense from the consequences of prematurely offering an opinion from an improperly prepared defense expert.

The defense cites *Harris v. Cassia County* in support of its argument that Rhoades need not have demonstrated an "accrued right" to assert the insanity defense before being entitled to a declaratory ruling on the issue. That involved a case filed by indigent recipients of county benefits for payment of claims for prescription drugs. After twice being denied benefits in two successive years after the annual county allotment for indigents was exhausted, the plaintiffs requested a declaratory judgment to the effect that the county was not entitled to cut off their benefits whenever the county indigency fund was depleted. At the time of the action, the county fund had been rejuvenated, and the county argued that the plaintiffs claims were no longer justiciable, as their claims were again being paid by the county.

The Court, in *Harris*, in holding that the case was indeed justiciable and appropriate for declaratory judgment, noted that both plaintiffs were currently enrolled as recipients of county indigency benefits. The Court stated that although neither plaintiff had a pending application for indigent aid at the time, their county benefits had been terminated twice before on the basis of inadequate funds. In *Harris*, the Court based its determination on the actual and existing facts on the record, implicitly holding that the plaintiffs' claims were of the justiciable variety that are "capable of repetition, yet evading review."

In the present case, by contrast, there are no actual and existing facts on the record. The record before the trial court, and before this Court, contains nothing more than the statement of counsel that he desired to inquire into the viability of the defense, and that although Rhoades had been examined by a psychiatrist, no opinion in any form as to Rhoades's competency could be forthcoming until the court provided an operative legal definition of insanity. As to the impossibility of offering an opinion without a legal standard to work with, the court had only the bald statement of counsel to rely upon, there being no direct statement from the expert to this effect in the record. This statement of counsel does not provide a factual showing sufficient to create a justiciable issue before the court.

■ The testimony of Officer Rodriguez concerning Rhoades's manner on the night of his arrest likewise does not suffice to create a justiciable controversy on the issue of insanity. The officer stated during the preliminary hearing that on the night of the arrest:

Paul Rhoades was either acting as if he was high on some kind of narcotic, or he was high on some kind of narcotics.... [H]e really didn't have much stability ... he had to be helped to walk. He swayed back and forth when he sat down, almost in a drunken stupor. Didn't say too much, and when he did, he mumbled, as if, I would take it, he was not in control of his senses, ...

Other testimony confirms Officer Rodriguez's impressions of Rhoades's conduct on the night of the arrest, but there is no similar evidence in the record as to abnormal conduct at any other time. This testimony establishes that Rhoades was having physical difficulty on the night of his arrest, which was assumed by the officers present to be the result of drugs or intoxication. The trial court appropriately concluded that such evidence alone does not rise to the level of a showing on any enduring mental condition of the defendant.

■ The defense argues that any showing that might be required under the circumstances was waived by the prosecution

at the time of the hearing on the defense request for appointment of a psychiatric expert at state expense. The United States Supreme Court, in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), held that a defendant is constitutionally entitled to psychiatric assistance at state expense once a preliminary showing has been made that the mental condition of the defendant is likely to be an issue in the case. At the hearing, the prosecution represented that it had no objection to the appointment of a psychiatric expert, and further stated that:

> From the State's point of view from what we understand the evidence to be we would understand why they seek these two particular appointments, so we would urge the Court to go ahead and adopt that without requiring any further showing.

Defense counsel urges that this statement by the prosecution, and the court's acquiescence in the motion for a court appointed expert without requiring any preliminary showing on the defendant's mental condition, amounts to a waiver of the required showing on the issue. We disagree.

■ Justiciability is a question of the jurisdiction of the court over the case at issue. *Baird v. State*, 574 P.2d 713, 716 (Utah 1978); *Mountain West Farm Bur. Mut. Ins. v. Hallmark Ins.*, 561 P.2d 706 (Wyo.1977). It is axiomatic that a lack of jurisdiction may not be cured by means of stipulation or waiver by the parties. *Bowlden v. Bowlden*, 118 Idaho 84, 794 P.2d 1140 (1990). Therefore, this defense argument must be rejected.

We uphold the trial court's determination that the record does not create a justiciable issue to support a ruling on the issue of the repeal of the insanity defense.

BAKES, C.J., and SCHROEDER and REINHARDT, JJ., Pro Tem., concur.

JOHNSON, J., concurs in the result.

## III.

### SUPPRESSION OF INCULPATORY STATEMENTS

■ Rhoades was arrested on March 25, 1987. He was being sought as a suspect in an Idaho murder investigation, and when his car was identified in Nevada, a Nevada Highway Patrol Officer, George McIntosh, drove to the scene of the arrest with two officers from Idaho, Victor Rodriguez and Dennis Shaw, who were investigating unsolved homicides in Idaho. Two Nevada officers, Trooper Neville and Officer Miller, were holding Rhoades at the scene of the arrest. Another Nevada officer, Shires, arrived at the scene as back up. Shaw testified that as he and Rodriguez approached Rhoades where he was being held against the car by Neville and Miller, Rhoades made a spontaneous statement of "I did it," without being directly addressed or questioned by the officers. Miller claims to have heard that first statement, although it was not included in his initial report of the arrest. Miller did include that fact in a supplemental report filed two months later. Officer McIntosh testified that he did not hear the statement, nor was it overheard by Trooper Neville.

After being read his rights, Rhoades was transported to the Highway Patrol Substation in Wells, Nevada. He did not make any statements *en route*. Officers Shires, Miller, Neville, McIntosh, Shaw, and Rodriguez were present at the station. Shaw made a statement to the defendant to the effect that if he had been apprehended earlier, the victims of his crimes might still be alive. Rodriguez testified that in response to that statement, Rhoades stated, "I did it." This second statement at the station was not part of Miller's initial report, although he claims to have overheard it. Both Shires and Miller reported the statement in supplemental reports filed several months after the arrest. This statement was also not recorded by Officer Shaw in his report. Rhoades made no further statements.

Rhoades argues on this appeal that the trial court should have excluded those statements for three reasons: 1) the ques-

tionable reliability of the evidence, given the fact that several of the officers who claimed to have overheard the statements failed to record the fact in their reports until months after the arrest; 2) the failure of the police to tape record the statements; and 3) the statements were the result of the violation of Rhoades's Miranda rights.

On the first point, the defense argues that due process under the state and federal constitutions requires an enhanced degree of reliability during the guilt determination stage of a capital prosecution. We reject this argument.

The United States Supreme Court has imposed many procedural protections for capital cases. *See, e.g., Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). However, the cases do not go so far as to alter the types of evidence or establish a minimum degree of reliability of evidence that may be admissible during the fact finding phase of a potential capital case. The prosecution in such cases is not required to prove the crime by any higher standard than the "beyond a reasonable doubt" standard used in other criminal cases. Admission of evidence is not governed by any separate rules applicable only in capital cases. Therefore, there is no reason to conclude that testimony which is questionable must be excluded during the guilt determination phase of a capital case. The credibility of evidence in a first degree murder case, as in all others, is an issue for the trier of fact.

■ Likewise, we cannot accept the contention that in order to be admissible, statements made in custody must be tape recorded by the police. The defense cites an Alaska case, *Stephan v. State,* 711 P.2d 1156 (Alaska 1985), holding that custodial confessions must be tape recorded in order to be admissible under the due process clause of the Alaska State Constitution. That case represents no more than the prerogative of each state to extend the protections of its own constitution beyond the parameters of federal constitutional guarantees. We decline to adopt Alaska's standard in Idaho.

■ We now turn to the issue of whether Rhoades's Miranda rights were violated by the police during his arrest and custody.

There is some conflict in the record as to whether Rhoades was read his Miranda rights while in the custody of Nevada Officers Miller and Neville, or if he was given the Miranda warnings for the first time by Officer Rodriguez after Rodriguez, Shaw, and McIntosh arrived at the scene. Although the record does not support the trial court's finding that the first statement by Rhoades was preceded by a Miranda warning, that factual issue does not affect our conclusion that both statements were properly admitted into evidence.

The first "I did it" statement, while Rhoades was handcuffed in the parking lot was apparently spontaneous. So spontaneous in fact, that according to uncontested police accounts, Rhoades made the statement without being questioned or otherwise addressed by any of the officers present. As a spontaneous statement, it was admissible whether it occurred before or after Rhoades was read his Miranda rights.

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.... Volunteered statements of any kind are not barred by the Fifth Amendment." *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). Although the statement entirely lacked any context to make it meaningful, the trial court correctly concluded that it was for the jury to decide to what Paul Rhoades referred when he said "I did it" at the scene of the arrest.

■ The second statement at the station house, made in response to Shaw's comment, is also admissible. The trial court found that there was insufficient evidence in the record to support the inference that Rhoades had asserted his right to remain silent at any time during the arrest and booking. Officer McIntosh did testify that after Rodriguez finished reading the Miranda rights, Rhoades nodded as if to indicate that he understood. Then McIntosh testified that Rodriguez said something

else, which McIntosh could not hear, whereupon Rhoades shook his head. McIntosh took the gesture to mean that Rhoades was asserting his right to remain silent.

Those facts are the sole basis in the record for the contention that Rhoades did assert his right to remain silent. There is no evidence in the record as to what Rhoades was responding to when he shook his head negatively. On the strength of this evidence alone, the trial court declined to infer that the shake of the head indicated a desire to remain silent. That finding is not clearly erroneous, given the absolute lack of evidence to the contrary.

*Miranda* teaches that "[o]nce warnings have been given, the subsequent procedures are clear. If the individual indicates in any manner, at any time, prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627.

██ In this case, based on the record before us, Rhoades did not assert his right to remain silent. If he had, Shaw's comment, properly found by the trial court to be "the functional equivalent of interrogation," would have been improper, and the second statement would not have been admissible. However, the *Miranda* rule does not require police to maintain total silence toward the suspect until they are presented with a valid waiver of *Miranda* rights. Rather, the requirement that interrogation must cease comes into play when the accused indicates in any manner that he or she does not want to converse with the police, or that the presence of an attorney is desired. After rights are read to and acknowledged by the detainee and until the right to silence or counsel is asserted, the police may initiate questioning.

The record indicates that Rhoades was read his rights before the second statement and acknowledged that he understood them. Although there is evidence that Rhoades was heavily influenced by narcotics at the time of the arrest, Officer Shaw testified that while searching his person, he engaged Rhoades in conversation to test

his alertness and found that he had sufficient capacity to understand what was going on around him.

In sum, Rhoades had been instructed upon and understood his rights at the time of arrest, and there is insufficient evidence to indicate that he asserted his right to remain silent. For the foregoing reasons we conclude that the second statement made in response to Shaw's "interrogation" is not subject to suppression under *Miranda v. Arizona.*

BAKES, C.J., JOHNSON, SCHROEDER and REINHARDT, JJ., Pro Tem., concur.

## IV.

### JAILHOUSE INFORMANT TESTIMONY

██ The defense made a pretrial motion to exclude the testimony of two persons listed as prosecution witnesses, David Holm and Cliff Jones. Both men were inmates at the penitentiary where Rhoades was incarcerated, and both had offered to testify that Rhoades had confessed to the murder of Nolan Haddon in their presence.

Both witnesses had previous felony convictions. David Holm had a history of offering testimony to law enforcement officials in return for favorable treatment in his own criminal cases. The defense had a full panoply of other witnesses prepared to testify that Holm had a reputation for untruthfulness. The facts contained in the alleged confession could have been ascertained by Holm independently of Rhoades himself during a twenty-four hour period in which the two men shared a cell containing all of Rhoades's personal files documenting his case. Holm also had access to media during the time that the Rhoades case was in the news. At the time that he came forward with Rhoades's purported confession, Holm was awaiting sentencing on two felony charges, as well as an additional "persistent violator" charge that might have landed him in prison for life.

At the time that Cliff Jones stepped forward with incriminating evidence against Rhoades, he immediately asked for reduc-

tion of the twelve-year sentence he was then serving, in return for his "cooperation."

The defense urged the trial court to exclude this evidence prior to trial, on the ground that it was inherently unreliable. The trial court declined to do so, although expressing its own skepticism regarding the truthfulness of the testimony. The court ruled that the credibility of the evidence was an issue for the jury, but that it would require a foundation, allow liberal cross-examination when the time came, and would also consider an instruction to the jury to the effect that the "jailhouse informant" testimony should be regarded with suspicion.

On appeal, Rhoades argues that to allow such questionable testimony constituted a violation of the due process clauses of the state and federal constitutions. He contends that the evidence should have been excluded under I.R.E. 403, whereby the trial court may exclude relevant evidence if its prejudicial effect outweighs its probative value.

There are very few categories of people whose testimony must be excluded as a matter of law. In general, every person is competent to be a witness, except "[p]ersons whom the court finds to be incapable of receiving just impression of the facts respecting which they are examined, or of relating them truly." I.R.E. 601(a). "The determination of whether a witness is credible is one of fact, and in the context of a suppression hearing, is to be made by the trial court." *State v. Fain*, 116 Idaho 82, 86, 774 P.2d 252, 256 (1989). As long as the evidence offered by the testimony is relevant under I.R.E. 402, any person meeting the above qualifications may testify, subject, of course, to exclusion in the discretion of the trial court under I.R.E. 403.

In this case, both informants presumably had the capacity to tell the truth. The evidence of Rhoades's confession which the witnesses offered was certainly relevant to the case. Whether any shred of truth was contained within their testimony was a matter for a jury to evaluate. As the trial court noted, the defense at trial had "fer-

tile ground for cross-examination" and impeachment of these witnesses.

The defense has cited numerous cases containing judicial recognition of the dubious nature of confession evidence coming from fellow prison inmates. *People v. Campa*, 36 Cal.3d 870, 206 Cal.Rptr. 114, 686 P.2d 634 (1984); *People v. Mroczko*, 35 Cal.3d 86, 96, 197 Cal.Rptr. 52, 57 n. 8, 672 P.2d 835, 840 n. 8 (1983). However, those cases address the issue in the context of the adequacy of information creating probable cause to issue a warrant, the determination of which involves reliability of informants as a crucial factor. None of the cases cited lead to the conclusion that jailhouse informant testimony must be excluded from all courtroom proceedings as a matter of law.

 The defense requested the trial court to disallow the testimony under I.R.E. 403, which allows the trial court to exclude relevant evidence where "its probative value is substantially outweighed by the danger of unfair prejudice, ..." The standard by which we review such a decision is whether the trial court committed an abuse of discretion. *Davidson v. Beco Corp.*, 114 Idaho 107, 110, 753 P.2d 1253, 1256 (1987). In extreme cases, admission of evidence carrying a high degree of unfair prejudice and negligible probative value may result in a violation of state and federal due process. Wright & Graham, *Federal Practice and Procedure* § 5215, at 274.

This Court has previously explained the weighing process that must accompany a Rule 403 motion:

The rule creates a balancing test. On one hand, the trial judge must measure the probative worth of the proffered evidence. The trial judge, in determining probative worth, focuses upon the degree of relevance and materiality of the evidence and the need for it on the issue on which it is to be introduced. At the other end of the equation, the trial judge must consider whether the evidence amounts to unfair prejudice. Here, the concern is whether the evidence will be given undue weight, or where its use results in an inequity, or as several com-

mentators have suggested, "illegitimate persuasion." Only after using this balancing test, may a trial judge use his discretion to properly admit or exclude the proffered evidence.

*Davidson*, 114 Idaho at 110, 753 P.2d at 1256 (citations omitted).

 It is clear that evidence of a confession of the crime charged is highly relevant and probative. Although it is also highly prejudicial to the defense, the inquiry is not whether the evidence is harmful to the strategy of the party opposing its introduction. Any evidence is prejudicial to the party whose theory of the case it contradicts. *State v. Fenley*, 103 Idaho 199, 203, 646 P.2d 441, 445 (Ct.App.1982), *no pet. rev. filed*. The proper focus of the trial court is upon "unfair prejudice;" whether fact to be shown by the evidence justifies the tendency of the evidence to "persuade by illegitimate means." Wright & Graham *Federal Practice and Procedure* § 5215, at 275. In other words, evidence should be excluded if it invites inordinate appeal to lines of reasoning outside of the evidence or emotions which are irrelevant to the decision making process.

In this case, we cannot say that the probative value of the evidence is outweighed by unfair prejudice to the defendant as a matter of law, especially since the court offered to mitigate the effect of the testimony by allowing liberal cross-examination of the informers and by considering jury instructions to the effect that the testimony should be regarded with suspicion. We therefore conclude that state and federal due process guarantees are not implicated by the trial court's failure to exclude evidence of dubious veracity, and that the trial court's decision did not amount to an abuse of discretion.

BAKES, C.J., JOHNSON, J., and SCHROEDER and REINHARDT, JJ., Pro Tem., concur.

## V.

## DISQUALIFICATION OF TRIAL JUDGE FOR PREJUDICE

 Prior to facing charges for the murder of Nolan Haddon, Rhoades was tried and convicted for the murder of Susan Michelbacher by a jury, and sentenced to death by the same judge who presided over the Haddon case. In deciding that the death penalty was appropriate for the Michelbacher homicide, the trial judge made detailed findings of fact, as required by statute. Those findings, weighing the aggravating and mitigating factors of the crime and Rhoades's character, concluded that, "[t]he murder and accompanying acts are those of someone morally vacant and totally devoid of conscience," and that the circumstances of the crime were "extremely wicked and vile, shockingly evil, and designed to inflict a high degree of physical and mental pain with utter indifference to and with the apparent enjoyment of the suffering...." The judge also found that Rhoades has a propensity to commit murder and constitutes a continuing threat to society.

Rhoades moved to disqualify the trial judge from the Haddon case, arguing that after having reached such extreme and negative conclusions concerning the defendant, the trial judge could not possibly remain neutral during a second trial of the same person for a different crime.

A majority of the Court sitting on this case is of the opinion that this issue, as framed by the appellant, is not necessary to decide as the defendant was not sentenced to death in this case, or for the reason that the trial judge is able to carry out the duties of sentencing and still afford a defendant a fair trial in a subsequent proceeding.

SCHROEDER and REINHARDT, JJ., Pro Tem., concur.

BAKES, C.J., concurs in result.

JOHNSON, J., specially concurring.

## VI.

## WITHHOLDING OF EXCULPATORY EVIDENCE BY PROSECUTION

 On May 15, 1987, the defense filed a request for discovery, asking for "[a]ll

Bingham County and/or Blackfoot City Police Reports or investigative materials relative to the Stacy Baldwin homicide which is alleged to have occurred in Bingham County." On July 2, 1987, the prosecution filed a Supplemental Response to Defendant's Discovery Request, listing the items that it had provided pursuant to the discovery request, including "[a]ll Bingham County and/or Blackfoot City Police Reports" relative to the Baldwin case.

Part of the materials submitted to the defense in this exchange was a supplementary police report by Detective Newbold of the Blackfoot Police Department, which detailed the confession of Kevin Buckholz to the killing of Stacy Baldwin. Buckholz had been arrested by Blackfoot Police Officer Love on March 14, 1987, for drunk and disorderly conduct. Love's brief report indicated that Buckholz stated he had "killed the girl at the mini barn." Later, while he was in the holding tank, Buckholz initiated conversation with Officer Larry Christian. Christian filled out the following report of the conversation:

> [A] prisoner in the holding tank started talking to me (Kevin Buckholt) [sic] said he "had problems and needed to be put away cause he couldn't function in the regular world," he then proceeded to tell me he shot a girl twice in the back. I said what girl and he said "You know the one from the mini barn." I then asked how many shots did you fire, he said "I don't know I shot several times, I hit her in the back twice." ... I then asked him what kind of gun he used and he said "a '38' then said no a '9' mm I think." ...

Christian reported the incident to Detective Newbold, who summarized the statement in his own report. That report was provided to defense counsel for Rhoades pursuant to the discovery request for Blackfoot police reports.

Newbold's report mentions Christian's written report and outlines that report in detail. However, neither Christian's nor Love's report was provided to the defense. On appeal, Rhoades argues that the prosecution's compliance with the discovery request was inadequate and in violation of the prosecutor's duty to turn over all exculpatory evidence to the defense.

Although this appeal concerns the conviction for the murder of Nolan Haddon, Buckholz's confession is significant because the killings of Haddon and Baldwin were linked by ballistic evidence establishing that the same murder weapon was used in the commission of both crimes.

 The test by which to measure the prosecutor's duty to disclose evidence is the materiality of the information at issue. The determination of "materiality" is guided by whether the information tends to create a reasonable doubt about guilt, *State v. Brown*, 98 Idaho 209, 560 P.2d 880 (1977), or is otherwise "obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request." *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1975).

We do not believe that the outcome of the trial would have been different had the defense received the two other police reports. Officer Newbold's report provided enough detail to stimulate additional inquiry if the defense had been inclined to do so. The defense had the information that there was a confession to the Baldwin murder, the identity of the confessor, the details of the confession, and the name of the officer who heard the confession. With that information they could have contacted Officer Christian and Kevin Buckholz and determined from them whether the confession was worth pursuing. The defense claims that had they received the two additional reports from the prosecution then they would have made more of an effort to locate Buckholz. We believe that the defense could have made that determination without the other two police reports.

BAKES, C.J., JOHNSON, J., and SCHROEDER and REINHARDT, JJ., Pro Tem., concur.

## VII.

## FORM OF WEAPONS ENHANCEMENT CHARGES

 Rhoades contends that the prosecution's decision to charge weapons en-

hancements as separate counts in the indictment was prejudicial, in that it would lead a jury to believe that Rhoades was charged with additional crimes. He argues that I.C. § 19–2520, which allows enhanced sentences for the use of a firearm or deadly weapon in the commission of certain felonies, does not create a separate substantive crime, and should not be permitted to be present in the information in a format which could lend the impression that it constitutes a separate crime.

The statute specifically provides that a person convicted of certain enumerated felonies "who displayed, used, threatened, or attempted to use a firearm or other deadly weapon while committing the crime, shall, be sentenced to an extended term of imprisonment." I.C. § 19–2520. In order to impose this additional term, the defendant must be "separately charged in the information or indictment and admitted by the accused or found to be true by the trier of fact...." The trial court followed the explicit language of the statute. This was not error.

BAKES, C.J., JOHNSON, J., and SCHROEDER and REINHARDT, JJ., Pro Tem., concur.

### VIII.

### CONCLUSION

Rhoades entered a conditional guilty plea to the murder of Nolan Haddon pursuant to Idaho Criminal Rule 11. That rule provides that if the appeal of issues raised in the conditional plea is successful, the defendant shall be entitled to withdraw the guilty plea and stand trial.

Our analysis has established no issue that constitutes reversible error thus permitting withdrawal of the plea entered by this appellant.

BAKES, Chief Justice, concurring specially:

With regard to Parts I and III, I agree with the Court that there was no evidence to raise a justiciable issue as to the constitutionality of the repeal of the insanity defense. However, if there had been, I agree with Justice Johnson that that issue

is now foreclosed by virtue of our decision in *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990).

JOHNSON, Justice, concurring, concurring in the result and concurring specially:

I concur in the Court's opinion, except parts I–II (PRETRIAL RULING ON AVAILABILITY OF INSANITY DEFENSE) and part V (DISQUALIFICATION OF TRIAL JUDGE FOR PREJUDICE).

I concur in the result of parts I–II. In my view, there was a justiciable issue as to the constitutionality of the repeal of the insanity defense. However, this Court ruled in *State v. Searcy*, 118 Idaho 632, 798 P.2d 914 (1990) that the repeal of the insanity defense was not in violation of either the United States Constitution or the Constitution of the State of Idaho. Since no rehearing was requested in *Searcy*, a remittitur has issued, and the Court's opinion has become final. Although I dissented from this ruling of the Court in *Searcy*, I now accept that *Searcy* should be honored under the rule of stare decisis.

I concur specially in part V. In my view since the district judge who was the subject of the motion to disqualify did not sentence Rhoades to death in this case, I do not believe we should address the issue raised concerning his disqualification.