# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PAUL EZRA RHOADES,
        *Petitioner-Appellant,*

v.

JEFF HENRY, of the Idaho State
Prison;* LAWRENCE WASDEN,
Attorney General of the State of
Idaho,**

        *Respondents-Appellees.*

No. 07-35808

D.C. No.
CV-97-00170-S-EJL

OPINION

Appeal from the United States District Court
for the District of Idaho
Edward J. Lodge, District Judge, Presiding

Argued and Submitted
February 3, 2010—Seattle, Washington

Filed March 8, 2010

Before: Pamela Ann Rymer, Ronald M. Gould and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Rymer

---

*Jeff Henry is substituted for his predecessor, Dave Paskett, of the
Idaho State Prison. Fed. R. App. P. 43(c)(2).

**Lawrence Wasden is substituted for his predecessor, Alan Lance,
Attorney General of the State of Idaho. Fed. R. App. P. 43(c)(2).

3595

## COUNSEL

Oliver W. Loewy, Federal Defender Services of Idaho, Moscow, Idaho, for the petitioner-appellant.

L. LaMont Anderson, Deputy Attorney General, Boise, Idaho, for the respondent-appellees.

## OPINION

RYMER, Circuit Judge:

Paul Ezra Rhoades appeals the district court's denial of his petition for writ of habeas corpus. He was convicted following entry of a conditional *Alford* plea[1] for the 1987 second-degree murder and robbery of Nolan Haddon.[2] He received two indeterminate life sentences. The Idaho Supreme Court

---

[1]*Alford v. North Carolina*, 400 U.S. 25 (1970) (recognizing that a plea may be accepted for which there is a factual basis even though the defendant asserts his innocence).

[2]Rhoades was separately convicted for the shooting deaths of Stacy Baldwin and Susan Michelbacher, both of whom were killed with the same gun that killed Haddon during the same three-week period in February and March of 1987. Rhoades was sentenced to death both for killing and for kidnapping Baldwin, *see State v. Rhoades* (Baldwin), 820 P.2d 665 (Idaho 1991), and Michelbacher, *see State v. Rhoades* (Michelbacher), 822 P.2d 960 (Idaho 1991). Appeals from denial of federal habeas relief in both cases are also before us; we resolve them in separate opinions. *Rhoades v. Henry* (Baldwin), No. 07-99022, slip op. (9th Cir. March 8, 2010); *Rhoades v. Henry* (Michelbacher), No. 07-99023, slip op. (9th Cir. March 8, 2010).

upheld his conviction, sentence, and denial of post-conviction relief. *See State v. Rhoades* (Haddon), 809 P.2d 455 (Idaho 1991). We affirm the district court's judgment.

I

Nolan Haddon worked the night shift at Buck's convenience store in Idaho Falls, Idaho on March 16, 1987. The next morning, Buck's owner found Haddon lying on the floor in a pool of blood. He had been shot five times. He was still alive at the time, but unconscious. He died at the hospital. An inventory of the store showed that some BIC lighters, Marlboro cigarettes, and $116 in cash were missing.

The police suspected Rhoades of a string of burglaries, including one at Lavaunda's Lingerie, and obtained a warrant to arrest Rhoades for that burglary on March 23, 1987. They learned that he was in Nevada when, on March 24, a Nevada state trooper responded to an accident involving a green Ford that was reported stolen by Rhoades's mother, Pauline Rhoades. The next evening, two Nevada law enforcement officers arrested Rhoades inside a Wells Casino. They handcuffed him, placed him across the trunk of the police car, and advised him of his *Miranda* rights.[3]

Idaho officials were contacted and went to the Casino. As the Idaho team approached, Rhoades stated "I did it" without being questioned by anyone. Officer Victor Rodriguez, from Idaho, again advised Rhoades of his *Miranda* rights. Rhoades was asked if he understood those rights, and said something to the effect of "I do, yes." Detective Dennis Shaw, also from Idaho, searched Rhoades, and found two packages of Marlboro cigarettes and five BIC lighters similar to those taken from the store. Shaw also found a ten dollar bill, a one dollar

---

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966) (requiring that the police inform a person that he has a right to remain silent and the right to an attorney before custodial interrogation).

bill, and a one-hundred dollar bill. He told Rhoades he had found three dollars, to which Rhoades responded: "It better be $111." Rhoades was then taken to the Wells Highway Patrol substation for booking.

At the station, Shaw remarked that he wished he had arrested Rhoades on an earlier occasion, and that he would probably have saved the last victim's life. Rhoades raised his head and said, "I did it."

## II

The state filed an amended complaint charging Rhoades with Haddon's first degree murder and the robbery at Buck's convenience store.[4] Rhoades filed a motion to suppress all statements he made while in custody. Evidence was taken at the preliminary hearing, and the trial court conducted an evidentiary hearing on the motion to suppress. The court found that Rhoades's first "I did it" statement at the arrest scene was admissible because the statement was spontaneous. It found that Shaw's remark at the station was the functional equivalent of interrogation, but that Rhoades had been advised of his *Miranda* rights and had not invoked them. The court also found that Rhoades's second "I did it" statement at the station was voluntary because he appeared to understand and comprehend the situation.

Rhoades later filed another motion to exclude the "I did it" statements based on the officers' failure to tape record them, failure to record the statements in their police reports in a timely fashion, and failure of some of the officers present to hear the statements. Additionally, he argued that the statements were unreliable. The court declined to exclude either statement, noting that it had the benefit of testimony from the Michelbacher portion of the case. It found that the first state-

---

[4]The Haddon and Michelbacher murders were originally charged together, but the court severed them for trial.

ment was a spontaneous declaration and the second resulted from a casual comment; failure to record the statement, it held, went to weight rather than admissibility.

The state and Rhoades worked out a written plea agreement by which Rhoades would enter an *Alford* plea to second degree murder and robbery; he maintained his innocence but conceded that a conviction may be had on the charge of first degree murder; and he preserved the right to appeal denial of his motions. Pursuant to the plea, Rhoades was sentenced to indeterminate life for second degree murder and indeterminate life for robbery, to be served concurrently. On appeal, the Idaho Supreme Court held that the first "I did it" statement was admissible as a spontaneous statement whether it occurred before or after Rhoades was read his *Miranda* rights. 809 P.2d at 462. The Supreme Court also concluded that the second statement at the station was admissible. Although there was evidence that Rhoades was heavily influenced by narcotics at the time of his arrest, the court observed that Shaw testified he engaged Rhoades in conversation to test his alertness and found that Rhoades had sufficient capacity to understand what was going on around him. *Id.* at 463. The supreme court determined that Rhoades had been instructed upon and understood his rights, and there was insufficient evidence that he asserted his right to remain silent. *Id.* at 462-63.

Rhoades filed his petition for a writ of habeas corpus in federal district court on April 23, 1997. Therefore, it is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA) which became effective April 24, 1996.[5] *Woodford v. Visciotti*, 537 U.S. 19, 21 (2002) (per curiam).

---

[5]Under AEDPA, a writ of habeas corpus may not be granted unless the state court's decision "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

RHOADES v. HENRY (Haddon)

After other claims were dismissed on procedural grounds, the state moved for summary judgment on Rhoades's claims that the "I did it" statements were obtained in violation of *Miranda*, and that the trial judge was biased. In response, Rhoades sought to file Shaw's deposition testimony (taken in federal proceedings in the Baldwin case) and his police report, or to expand the record with excerpts which would have shown that en route from the casino to the station, Shaw and Rhoades engaged in a conversation during which Rhoades said "I don't want to talk about it." The district court granted summary judgment for the state and denied Rhoades's motion to expand the record. However, it made alternative findings that Rhoades's statement en route was not an unequivocal invocation of the right to stop all discussion, and that he impliedly waived his rights by choosing to reply to Shaw's comment. Finally, the court found that Rhoades presented no evidence to show the sentencing judge was biased. It denied the petition, as well as Rhoades's motion to alter and amend the judgment.

Rhoades has timely appealed the issue on which the district court granted a certificate of appealability (COA) — his claim that the "I did it" statements were obtained in violation of his *Miranda* rights, together with the denial of his motion to expand the record — and argues three others in his opening brief for which he did not receive a COA.[6]

---

[6]Circuit Rule 22-1(e) requires petitioners to brief certified and uncertified issues separately, under headings that distinguish them. Rhoades has not done this. We may decline on this account to address his uncertified issues. Advisory Note, Circuit Rule 22-1. As it happens in this case, there is only one certified issue which means that the uncertified issues stand out rather clearly. This time we will not dismiss them. Accordingly, we will consider whether the issues raised are fairly debatable among reasonable jurists such that a COA should issue. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

### III

Rhoades maintains that the district court erred in denying for lack of diligence leave to supplement the record with facts showing that the police continued custodial interrogation after he invoked his right to silence en route from the casino to the station. He claims that this was through no fault of his own, as he first learned of a statement that he made to Shaw when Shaw's deposition was taken in 1996 in the federal habeas proceedings in the Baldwin case. During the deposition Shaw produced a report he had written sometime after the arrest, in which he relates:

> On the way to the police station I continued to talk with [Rhoades]. He was very uncomfortable as he was so large and the car did not give him much room. I told him I was disappointed in him and he had lied to me about the burglary. I had tried to believe him and give him a chance but he had lied and conned me. I said we need to talk about it now so that you can get it off your chest. He said, "Aw bullshit, I don't want to talk about it.[ ] Get these fuckin cuffs off me."

At his deposition, Shaw explained that he was talking about the Lavaunda's Lingerie burglary in the car because he wanted to start chronologically and that's where his warrant was. He assumed that when Rhoades said he didn't want to talk about it, it was because he was cramped. Once inside the station, Shaw removed the handcuffs and proceeded to talk.

Rhoades's counsel were also deposed during the federal proceeding. Stephen Hart was the primary attorney on discovery and suppression issues. At one point Hart said that he couldn't recall reading Shaw's police report, but he also could not say it wasn't provided to him; at another point, he said "I don't have a specific recollection as to when I saw this report." John Radin, another of Rhoades's attorneys, testified

that he had seen Shaw's report pretrial. Both Hart and Radin stated in subsequently filed affidavits that the failure to offer the "I don't want to talk about it" statement was most likely the result of voluminous reports and contrary representations by Shaw and Rodriguez.

The district court denied Rhoades's motion to expand the record because it found a lack of diligence in developing the factual basis in state court. It noted that Rhoades was provided a hearing on his motion to suppress before the Michelbacher trial during which counsel examined and cross-examined the police officers, and that he pursued post-conviction relief in both the Michelbacher and Baldwin matters. Also, the court concluded that the state courts reasonably found that Rhoades was aware of the factual circumstances of his own arrest. Further, the district court found that Rhoades failed to show that counsel lacked access to the Shaw information before the Michelbacher trial. Although it found that Rhoades did not pursue opportunities to present additional facts in support of his claim in state court, the court went on to find that even if the record were expanded, the "I don't want to talk about it" statement was an ambiguous or equivocal reference to Rhoades's right to silence with respect to questioning about the unrelated Lavaunda's Lingerie burglary. Thus, Rhoades's "I don't want to talk about it" statement did not pertain to the murders, so even if he asserted his right to silence with respect to interrogation about the burglary of Lavaunda's Lingerie, it would not affect the validity of his waiver in relation to the "I did it" statement in response to Shaw's comment about the murders.

Rhoades maintains that his counsel did not have the information all along, as the district court thought, rather, the prosecution concealed it. He points out that at the preliminary hearing, the prosecutor elicited testimony from Shaw about the "I did it" statement at the scene of the arrest but not at the station. He notes that Shaw forgot to record the second statement in his report, from which Rhoades infers that Shaw

viewed the interrogation in the car and at the station as one continuous event and thus also forgot to include the "I don't want to talk about it" statement which could negate the force of the second "I did it" statement. Further, Rhoades emphasizes that his counsel made clear to the prosecutor at a discovery conference held on April 23, 1987, that the defense wanted each statement made by their client.[7] In sum, Rhoades submits, it is hard to imagine a lawyer who would miss the essential nature of either statement, therefore his counsel must not have seen the report. He believes the district court misconstrued counsels' deposition testimony as indicating they had seen it, given that Hart (who was the primary attorney on discovery and suppression issues) testified that if he had had Shaw's report, he would have used it.

[1] AEDPA constrains when the district court may hold an evidentiary hearing or expand the record pursuant to Rule 7 of the Rules Governing § 2254 cases if a state prisoner seeking federal habeas relief has failed to develop the factual record that supports a claim in state court. *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam); *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005). Section

---

[7]The conference was recorded and reflects the following exchange:

[Defense counsel]: [In addition to Officer Burgess' recorded interrogation of Rhoades] [a]re there any other written or oral statements made by Mr. Rhoades?

[Prosecuting Attorney]: To my knowledge there are not, other than those that may be recounted in Detective Shaw's report of statements that Rhoades made to him in the course of their contact in Nevada. but those are recounted in the police report that you have received already.

Like I say, as far as a transcript of recorded statement, that that [sic] I have referred to is all that I am aware of. There may be one or two words that are referred to by Detective Shaw in his report, and you'll have to glean those from the report. But as far as a separate statement, there is none.

Discovery Hrg. Tr. at 5 (April 23, 1987).

2254(e)(2) only allows new evidence to be considered in the federal proceeding if, among other requirements, the factual predicate "could not have been previously discovered through the exercise of due diligence."[8] "[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). As we have held, a petitioner who "knew of the existence of [ ] information" at the time of his state court proceedings, but did not present it until federal habeas proceedings, "failed to develop the factual basis for his claim diligently." *Cooper-Smith*, 397 F.3d at 1241.

It is unclear whether our review of a district court decision not to expand the record is for abuse of discretion or *de novo*. *Id*. at 1241 n.12. Either way, resolution of this issue follows from *Cooper-Smith*. There the petitioner sought to buttress his claim of ineffective assistance of counsel by an affidavit of his doctor regarding what the doctor would have testified to at trial had he been called. *Id*. at 1241. Cooper-Smith knew of the information at the time of state court proceedings, yet failed to present it. As a result, we held that he failed to

---

[8]Section 2254(e)(2) provides in full:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that —

(A) the claim relies on —

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

develop the factual basis for his claim diligently, and therefore could not meet the requirements of § 2254(e)(2). *Id*. Accordingly, we concluded that the district court properly declined to expand the record under Rule 7.

[2] We reach the same conclusion here, for the same reason. The deposition testimony and affidavits of both counsel support the district court's finding that Rhoades failed to show this counsel lacked the information contained in the Shaw report. In addition, Rhoades was a participant in the conversation and made the statement himself. As the state courts and the district court found, he was aware of what was going on around him when he was arrested.[9] And the exchange between his counsel and the prosecutor at the pretrial discovery conference, upon which Rhoades relies to show that he asked for his statements, in fact shows that the prosecutor thought the Shaw report had been turned over. The prosecutor confirmed there were no statements "other than those that may be recounted in Detective Shaw's report of statements that Rhoades made to him in the course of their contact in Nevada. But those are recounted in the police report that you have received already." Either counsel had the report, as the prosecutor believed, or they were alerted to it by this discussion such that they could have followed up if indeed they didn't have it.

[3] For these reasons, we agree with the district court that Rhoades did not diligently develop the factual predicate for this claim in state court. Consequently, he failed to satisfy the

---

[9]Rhoades's argument in reply that he had no memory of invoking his right to silence is without basis in the record. In any event, the Idaho Supreme Court acknowledged evidence showing that Rhoades was under the influence of drugs, but found that he understood what was going on around him at the time of his arrest. *Rhoades* (Haddon), 809 P.2d at 463. As we explain in our opinion in the Baldwin case, this finding is supported by evidence that Rhoades reacted alertly during his exchange with Shaw at the arrest scene. *See Rhoades* (Baldwin), slip op. at 3530-31.

core requirement of § 2254(e)(2). As a result, the district court did not err in failing to expand the record.

IV

Rhoades next challenges the district court's alternative ruling on the merits that his "I don't want to talk about it" statement did invoke his *Miranda* rights with respect to the "I did it" statement at the station. He argues that the ruling should not have been made without an evidentiary hearing, and in any event, was wrong. However, we do not address this issue given our conclusion that the district court did not err in declining to expand the record. In light of the district court's principal and dispositive ruling, its alternative ruling is just alternative. There is no need for us to reach it.

V

**[4]** Rhoades's remaining issues are uncertified for appeal. An appeal may not be taken unless the district judge or we issue a certificate of appealability. 28 U.S.C. § 2253(c)(1). A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). This requires Rhoades to establish that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.' " *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). We are to resolve doubts about the propriety of a COA in the petitioner's favor. *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002).

A

Sentencing in the Haddon case occurred three weeks after sentencing in the Michelbacher case. The same judge presided over both matters. In the course of sentencing Rhoades for the

Michelbacher murder, the judge found that Rhoades was "morally vacant and totally devoid of conscience," had a propensity to commit murder, constituted a continuing threat to society, and had committed an offense that was "extremely wicked and vile, shockingly evil, and designed to inflict a high degree of physical and mental pain with utter indifference to and with the apparent enjoyment of the suffering." Rhoades claims that the judge was biased in the Haddon case for having made these findings in the Michelbacher case. The judge himself stated that the findings he made in the Michelbacher case were limited to those facts relating to the Michelbacher case, and would have nothing to do with the Haddon portion of the case. In denying Rhoades's motion to disqualify, the judge also noted that he had no bias or prejudice toward Rhoades that was either personal or in a judicial capacity. The Idaho Supreme Court concluded that no due process violation occurred, 809 P.2d at 465, and so did the district court.

**[5]** Due process requires that trials be conducted free of actual bias as well as the appearance of bias. *In re Murchison*, 349 U.S. 133, 136 (1955). There is a strong presumption that a judge is not biased or prejudiced, *Bracy v. Gramley*, 520 U.S. 899, 909 (1997), and the Supreme Court made clear in *Liteky v. United States* that "[i]t has long been regarded as normal or proper for a judge to sit . . . in successive trials involving the same defendant." 510 U.S. 540, 551 (1994). In that connection, the Court observed that a "judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person." *Id*. at 550-51. "But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings . . . ." *Id.* at 551. Thus, judicial rulings alone are almost never sufficient to support a request for recusal. *Id*. at 555; *see also Poland v. Stewart*, 117 F.3d 1094, 1103 (9th Cir. 1997).

**[6]** The propriety of the Idaho Supreme Court's determination in light of *Liteky* is not reasonably debatable. The record supports the trial judge's own assessment. And as the district court concluded, Rhoades points to no evidence that the judge was unable to preside over his case in a fair and impartial manner.

**[7]** Accordingly, we decline to issue a certificate of appealability.

B

**[8]** AEDPA has a one-year statute of limitations, *see* 28 U.S.C. § 2244(d), unless claims are "tied to a common core of operative facts" in the original pleading and thus relate back under Fed. R. Civ. P. 15(c) to the initial filing, *Mayle v. Felix*, 545 U.S. 644, 664 (2005), or the claims are based upon newly discovered evidence, in which case the one-year period begins to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence," 28 U.S.C. § 2244(d)(1)(D). As direct review in this case was completed in 1991, Rhoades had a grace period of one year from April 24, 1996, AEDPA's effective date, within which to submit an application for habeas relief.

**[9]** Rhoades's original filing was timely, but in 2005 he sought leave to amend his petition to raise three claims that he contended were newly discovered. These new claims arose out of alleged misconduct of the prosecutors in the Michelbacher case based on testing done by the FBI laboratory before the Michelbacher trial. Rhoades retained an expert in 2005 who interpreted the FBI results to exclude him as a contributor of the semen removed from the victim in that case. The district court found that none of the claims relate back, which is plainly correct. Rhoades's original claims involved police questioning at the time of his arrest, jailhouse informant testimony, and judicial bias.

**[10]** The court denied leave as untimely, because Rhoades admittedly had the FBI report since the late 1980s and failed to exercise due diligence to develop the factual predicate of the claim. As the district court correctly concluded, Rhoades could have run the FBI report by another expert, and tried to uncover the factual predicate for these claims, long before he did. In the face of this record, Rhoades's suggestion that the state's misconduct camouflaged the factual basis of his claim is clearly unavailing. *Banks v. Dretke*, 540 U.S. 668 (2004), upon which he relies, is inapposite as there, the prosecution never disclosed that one of its key witnesses was an informant, whereas here, the prosecution did not conceal the FBI report. *See id.* at 675-77.

**[11]** We see nothing debatable about the district court's ruling that warrants certification. The claim unquestionably fails.

### C

**[12]** Finally, Rhoades asserts that the district court erred in holding that three of his grounds for relief were barred by the *Teague* retroactivity doctrine. In *Teague v. Lane*, 489 U.S. 288 (1989), the Court held that a federal court may not apply a new constitutional rule on collateral review of a state court judgment, subject to exceptions that are inapplicable here. *Id.* at 310. A "new rule" is one that "breaks new ground or imposes a new obligation" on the state, or was not "*dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 301. A result is "dictated" when "*no other* interpretation was reasonable." *Lambrix v. Singletary*, 520 U.S. 518, 538 (1997).

**[13]** In the district court, Rhoades moved to exclude his "I did it" statements and the testimony of jailhouse informants, and to recuse the trial judge, on the footing that evidence in his capital proceedings must meet a heightened reliability threshhold before being admitted. The district court ruled that

applying a "heightened standard of reliability" to these guilt-phase issues would be *Teague*-barred. It did so because such a rule was not dictated by precedent at the time Rhoades's convictions became final in 1991.

**[14]** Rhoades argues to the contrary by citing to the long line of Supreme Court cases that apply enhanced standards of reliability to capital *sentencing procedures*. *See, e.g., Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (noting the Eighth Amendment's heightened "need for reliability in the determination that death is the appropriate punishment in a specific case"); *California v. Ramos*, 463 U.S. 992, 998-99 (1983) (recognizing "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination"); *Herrera v. Collins*, 506 U.S. 390, 405 (1993) (noting "the Eighth Amendment requires increased reliability of the process by which capital punishment may be imposed"). However, Rhoades was urging the district court to apply a heightened standard to *guilt phase* issues. Rhoades offers reasons why this should be so, but no precedent that dictates it. Accordingly, to adopt his proposed rule would inarguably be to apply a new rule. Reasonable jurists would not debate that this would offend *Teague*. Therefore, we decline to issue a COA.

AFFIRMED.