COMMONWEALTH *vs.* CHARLES FRYAR, JR.

Hampden. November 5, 1992. - April 7, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Assault and Battery by Means of a Dangerous Weapon. Jury and Jurors. Practice, Criminal,* Challenge to jurors, Indictment. *Constitutional Law,* Waiver of constitutional rights. *Waiver. Evidence,* Past recollection recorded, Grand jury proceedings.

In the circumstances of a murder trial in which the defendant, a young black man, was accused of stabbing a white college student in a black versus white street brawl, the judge erred in ruling that the prosecution satisfied its burden of providing an adequate race-neutral reason for challenging the sole black member of the venire, with the result that the defendant was entitled to a new trial. [738-741]

In a murder case, there was sufficient evidence to support the judge's findings that statements the defendant made to police were voluntary [741-743], and that the police did not intentionally delay the defendant's arraignment [743].

Evidence at a grand jury proceeding was sufficient to support an indictment for murder in the first degree. [744]

At a murder trial, the evidence was sufficient to support a conviction of murder and two convictions of assault and battery by means of a dangerous weapon. [744-745]

At a murder trial, certain grand jury testimony was improperly admitted as past recollection recorded where there was no evidence that the witness saw, or adopted, the grand jury transcript as being accurate at or about the time of the events to which her testimony related, in accordance with the standard set forth in *Commonwealth v. Bookman,* 386 Mass. 657, 663-665 (1982). [745-746]

INDICTMENTS found and returned in the Superior Court Department on May 10, 1989.

A pretrial motion to suppress evidence was heard by *John F. Murphy, Jr.,* J. The cases were tried before *William W. Simons,* J., and a motion for a new trial was heard by him.

*Wendy Sibbison* for the defendant.

*Judy Zeprun Kalman*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. The defendant, Charles Fryar, Jr., a young black man, was indicted for the murder in the first degree of Eric Palmer, a white college student, as well as for assault and battery by means of a dangerous weapon on four of Palmer's white companions. The offenses allegedly occurred in Springfield in April, 1989. On April 3, 1990, after trial by jury, Fryar was convicted of murder in the first degree and on two indictments charging assault and battery.[1] The mandatory sentence of life imprisonment was imposed on the murder conviction; on the assault and battery convictions the trial judge sentenced the defendant to two terms of from eight to ten years to be served concurrently with the life sentence at the Massachusetts Correctional Institution at Cedar Junction. A motion for a new trial was heard in September, 1991, and denied in November, 1991.

The defendant appeals from his convictions and from the denial of his motion for a new trial. He argues numerous points of error. Because we conclude that the trial judge committed reversible error in allowing the Commonwealth to use a peremptory challenge against the sole eligible black member of the venire, we consider only that issue and the issues that are likely to recur at a new trial.

We begin with a brief statement of the facts, which we shall supplement as relevant to a particular issue. On the night of April 13, 1989, a group of students from Springfield College was out to celebrate the beginning of the college's "Spring Fling." Some students began drinking beer at an off-campus party, and then proceeded to the Apremont Triangle section of Springfield, where a number of drinking establishments are concentrated. As the hour for the closing of the bars approached, a group of nine white students, including the victim, Eric Palmer, gathered for the purpose of sharing

---

[1] Of the four assault and battery charges, the Commonwealth entered a nolle prosequi on one and dismissed one at the close of its evidence. The convictions resulted from the beatings of David Savignano and Kimberly Palfry.

an automobile ride back to the campus. One student had gone ahead with the intention of bringing his automobile back to the area near the bars, where the rest of the students would join him.

The same evening, four black teenagers, Charles Fryar, Jr.; his cousin, Rodney Fryar; Lester Jowers[2]; and Tommy Barklow were out together. They spent a portion of the evening riding in Rodney Fryar's automobile. At some point in the evening, Charles Fryar removed a knife from the glove compartment of the automobile, and the four youths passed it around, examining it. The knife belonged to Rodney Fryar. Later, at the same time the group of college students was planning to leave the bars they had been patronizing, the four young men were also in the Apremont Triangle area. The college students approached the automobile that had come to meet them. The defendant and his friends were standing nearby as the students began piling into the automobile. One of the black youths directed a comment to the students suggesting that they would not all fit in the automobile. When all but one of the college students were inside the automobile, Lester Jowers threw a glass bottle against the automobile. The bottle shattered and pieces of glass landed inside the automobile. At this point, the college students came out of the automobile. A street brawl ensued between the two groups of young people. The brawl culminated in the stabbing death of Palmer. No one saw the stabbing.

During the confrontation, the defendant was seen swinging a dowel-like stick at some of the students. He was also seen sparring with the victim. Shortly after the brawl began, two Springfield police officers, on their way to answer an unrelated call, arrived at the scene. They observed the defendant and a student (not the victim) fighting. The defendant was moving backward as the student and what had by then become a large crowd of students moved toward him. The of-

[2]The defendant reports that Jowers was also indicted for the murder of Palmer but he was tried separately; the prosecution elected to proceed against Jowers on only so much of the indictment as charged murder in the second degree and the jury found him guilty of manslaughter.

ficers broke up the fight between the defendant and the student, and, as they were placing the defendant in custody, the officers heard a woman scream that someone had been stabbed.

The defendant was taken to the Springfield police station. For the next several hours, the police interviewed numerous witnesses and the four black youths. At approximately 6:40 A.M. the defendant signed a statement, typed by a police officer, in which the defendant described his activities the night before. He denied stabbing Palmer. Around 7:30 A.M., the police learned that Palmer had died as a result of the stab wound. The police interrogated the defendant a second time. At approximately 10:25 A.M. the defendant signed another statement that amended his earlier statement. The second statement stated, in part: "Also I did have a knife at the fight. I had hit the guy with the stick when he had the bottle in his hand. We continued fighting and I held his coat and was punching him. I then backed away and I saw Tommy with the knife in his hand. I took the knife from Timmy [*sic*]. The guy then charged at me and I stuck the knife in his stomach."

1. *The peremptory challenge.* All the members of the jury that convicted Charles Fryar of murder in the first degree were white. Fryar argues that the Commonwealth's peremptory challenge of the sole eligible black venireperson violated arts. 1 and 12 of the Massachusetts Declaration of Rights as well as the equal protection clause of the Fourteenth Amendment to the United States Constitution. We agree. We describe the jury selection process and the facts surrounding the peremptory challenge.

Jury selection occurred over two days. Each day, the judge employed a two-part screening process. First, the judge addressed the venire as a group, after which some venirepersons came forward and were individually questioned and, in some instances, excused. Next, the judge conducted an individual voir dire of the remaining venirepersons, at which time challenges for cause and peremptory challenges were exercised by either party.

On the second day of jury selection, the judge provided certain basic information to the venire, as he had done on the first day. He listed the names of the parties and potential witnesses and attorneys, and described the nature of the case and how long he expected the trial to last. He concluded by stating:

> "I am now going to ask those of you who are affected by any of this information, that is, any of you who may feel that they will be suffering a hardship if required to serve as jurors for the length of this trial, or have had some contact with any party or attorney or witness or place, or who may know of some information about the case from some source, *or have anything to report to me concerning your ability to serve as an impartial juror*, I'm going to ask you to let us know now. I will see you one at a time in the presence of the attorneys here at the side of the bench." (Emphasis added.)

The first venireperson to approach the bench informed the judge that one of the potential police witnesses was a close family friend, and she was excused. The second and third venirepersons to come forward stated reasons for being unable to participate for the length of the trial, and were excused. The fourth venireperson to come forward knew one of the witnesses, and was also excused. The fifth venireperson that day to come forward was Rayford Williams, the only black person in that day's panel.[3] Williams did not approach the bench to offer an excuse as to why he could not serve on the jury. Apparently responding to the judge's entreaty to re-

---

[3]Two black venirepersons had been in the previous day's venire, and both had been excused for cause. The Commonwealth has challenged the defendant's characterization of Williams as the only eligible black juror, on the ground that there could have been other black people in the group whom the judge and attorneys did not notice. The judge found, however, that Williams was "the only black potential juror in the group of jurors available for impanelment that day." We are satisfied, based on the record, that there is no reasonable basis for suggesting that there were other black individuals in the venire that day.

port any information "concerning your ability to serve as an impartial juror," he reported that he could, in fact, serve as an impartial juror. Later that day, during the individual voir dire, Williams appeared to understand the questions posed to him and responded in an appropriate manner to each question. The judge declared Williams to be indifferent. The Commonwealth then exercised a peremptory challenge. The following colloquy occurred:

> DEFENSE COUNSEL: "Your Honor, I'm going to object to the Prosecutor being allowed to use a challenge to challenge the only black face we have seen in two days. . . . I have seen no other black faces in the remainder of the Jury Pool. I know what the law says. I know that [*Commonwealth* v. *Soares*, 377 Mass. 461, cert. denied, 444 U.S. 881 (1979)] says there has got to be a pattern. I suggest one is a pattern under the circumstances of this case."
>
> ". . .
>
> THE PROSECUTOR: "I think a pattern has to be established, and that *Soares* goes further and talks about several jurors being challenged before it's even incumbent upon the Court to ask for reasons for peremptory challenges. I don't think that's been established here."
>
> THE JUDGE: "I don't see a pattern. Frankly, I was disturbed by the fact he came up inappropriately in the first group of people looking for an excuse. I'm not sure he can follow instructions, for what it's worth."
>
> THE PROSECUTOR: "For what it's worth, that was one reason."

The prosecutor did not indicate what his other reasons were.[4]

---

[4]The prosecutor did mention that he had challenged a prior juror on the basis of her apparent inability to follow directions. In its brief, represented

In this appeal, Fryar argues that the exclusion of Williams from the jury denied him his right to be tried by a jury selected by nondiscriminatory criteria as guaranteed by art. 12, *Commonwealth* v. *Soares*, 377 Mass. 461, 488 (1979), and by the equal protection clause of the Fourteenth Amendment, *Batson* v. *Kentucky*, 476 U.S. 79, 89 (1986). A defendant who claims such a violation must make a prima facie showing that the prosecutor improperly removed a member or members of a discrete group from the jury. See *Batson, supra* at 96; *Soares, supra* at 489-490. In *Commonwealth* v. *Harris*, 409 Mass. 461, 465 (1991), we pointed out that the challenge of a single prospective juror within a protected class could, in some circumstances, constitute a prima facie case of impropriety.[5] The judge found, and we agree, that

by different counsel on this appeal, the Commonwealth attempts to bolster its claim that the challenge of Williams was appropriate by asserting that the challenge of this other juror was for exactly the same reason Williams was challenged. See *Commonwealth* v. *Mathews*, 31 Mass. App. Ct. 564, 571 (1991). The Commonwealth states: "[T]he prosecutor . . . challenged a white juror on the same basis: deficient understanding of the court's preliminary inquiry regarding availability to serve as a juror. A white juror who came up to the bench for no apparent reason was also excused." The record contradicts the Commonwealth's assertion. That challenged juror, on the second day of selection, had exhibited difficulty in understanding and answering some of the questions posed directly to her during the individual voir dire, and had not, as the Commonwealth states, come forward during the preliminary group inquiry as Williams had.

[5]Because *Commonwealth* v. *Harris*, 409 Mass. 461 (1991), was decided after the trial in the present case, the Commonwealth devotes substantial efforts in its brief to arguing that this principle from *Harris* is not retroactive. The Commonwealth's argument is not persuasive. We note the case is here on direct appeal. Moreover, the judge, in his memorandum and decision denying the defendant's motion for a new trial (which was issued after *Harris* was decided), expressly stated that the defendant had made a prima facie showing of impropriety because "one is a pattern under the circumstances of this case." The judge's finding of impropriety clarified the statement he had made during the voir dire ("I don't see a pattern") and clearly indicated that the first prong of the analysis had been satisfied. This finding of impropriety makes any discussion of *Harris'* retroactivity irrelevant. In any case, we agree with counsel for the defendant that, as *Harris* did not create "a sharp break in the line of earlier authority," retroactivity would be justified, *Commonwealth* v. *Ennis*, 398 Mass. 170, 174 (1986), and that even if it did create such a break, it would nonetheless apply to Fryar because he clearly preserved the issue and his case was

Fryar made a sufficient showing of impropriety to satisfy this requirement.

Once a defendant makes this showing, the burden shifts to the prosecutor to provide a race-neutral reason for challenging the venireperson in question. *Batson, supra* at 97-98. *Harris, supra* at 464. When trial counsel requested that the Commonwealth provide a race-neutral reason for the challenge, it was the judge who provided it. Before the assistant district attorney responded, the judge said: "Frankly, I was disturbed by the fact he came up inappropriately in the first group of people looking for an excuse. I'm not sure he can follow instructions, for what it's worth." The prosecutor readily agreed, stating that this was "one reason" he had for challenging Williams. He offered no other. We believe that it was inappropriate for the judge at that moment to suggest his own reason why Williams should not serve, particularly since the judge had twice ruled Williams could serve on the jury. When a defendant who has made a prima facie showing of impropriety requests that the prosecutor articulate his race-neutral reason for the challenge, that reason must come from the prosecutor, and not the judge. Otherwise, the judge risks assuming the role of the prosecutor (or trial counsel) leading to the result which obtains here. The judge's role is to determine whether the reason, proffered by the party whose peremptory challenge is at issue, is a "bona fide reason[ ] [or a] sham excuse[ ] belatedly contrived to avoid admitting facts of group discrimination." *Soares, supra* at 491, quoting *People* v. *Wheeler*, 22 Cal. 3d 258, 282 (1978).

If the judge in this case had doubts about Williams' ability to follow instructions, the judge should have excused him at the time the doubts surfaced, that is, when Williams approached the bench after the preliminary voir dire, or, at the latest, after the individual voir dire but before the Common-

---

pending on direct appeal when *Harris* was issued. See *Commonwealth* v. *Soares*, 377 Mass. 461, 493 n.38, cert. denied, 444 U.S. 881 (1979), and cases cited.

wealth exercised its challenge.[6] While it is true that "[a]n appellate court will accord substantial deference to [a] determination[ ] made by the trial judge [that an adequate reason for exercising a challenge exists] if supported by the record," *Commonwealth* v. *Mathews*, 31 Mass. App. Ct. 564, 569 (1991), and cases cited, there is no evidence in the record to indicate that Williams was unable to follow instructions. We note that, although the judge characterized the period following the preliminary inquiry as the time when members of the venire approach the bench "looking for an excuse," they were not told, "come forward if you have an excuse." Rather, they were told to come forward if, among other things, they had "anything to report to me concerning your ability to serve as an impartial juror." Williams, probably unschooled in the procedures of jury selection and listening carefully to the judge's instructions, was properly motivated to approach the bench to report that he could serve as an impartial juror. During the individual voir dire of Williams, when he was asked a series of questions probing his impartiality, he appeared to understand the questions completely and responded to them in an appropriate manner.

Thus, we conclude that the judge erred in ruling that the prosecutor satisfied his burden of providing an adequate race-neutral reason for challenging Williams. We reach this conclusion by considering a combination of factors: the judge's pronouncement of his own reservations about Williams at the precise moment the judge should have been ask-

---

[6]We do not mean to suggest that the judge had any improper motivation in expressing his reservations about the juror's ability to serve. Given the constitutional requirements of *Batson* v. *Kentucky*, 476 U.S. 79 (1986), and *Soares, supra,* however, his timing presents a problem. In denying the defendant's motion for a new trial, the judge explained the delay in expressing reservations about Williams as follows: "Viewing the record with hindsight, it is unfortunate that in efforts to avoid being unkind or gratuitous in one's remarks, otherwise clear indications of inadequate functioning or behavior is not clearly set forth in the record. This was such a case." The judge does not describe this "inadequate functioning or behavior" more than to refer generally to Williams' approaching the bench during the preliminary voir dire.

ing the prosecutor for his reason; the prosecutor's failure to indicate what his other reasons were, after indicating that he had other reasons, and the ambiguous nature of the instruction that Williams purportedly had difficulty understanding. We cannot say that any of these factors, standing alone, would cause us to hold that the challenge was improper. In making this determination, we are further influenced by the nature of this case. Although every defendant has a constitutional right to a jury selected by nondiscriminatory criteria, in some cases the racial composition of the jury necessarily will be of greater concern. See *Powers* v. *Ohio*, 499 U.S. 400, 415-416 (1991). This is such a case. Here, a young black man was accused of stabbing a white college student in a black versus white street brawl. No one saw the defendant stab the victim, and the defendant testified in his defense, denying that he had done so. The defendant argued that the statements he had made to the police were not voluntary and did not reflect fairly the events of that night. The victim's friends who testified were all white. In such a case, the "diffused impartiality" that comes from a diverse jury is invaluable. See *Soares, supra* at 485.

We believe that the exclusion of Williams from the jury created a significant risk that the "subtle group biases of the majority [were] permitted to operate, while those of the minority [were] silenced." *Soares, supra* at 488. Because the Commonwealth has failed to persuade us that the challenge of Williams was for a valid reason not linked to race, the convictions must be reversed.

We proceed to address the issues likely to occur at retrial.[7]

2. *The defendant's motion to suppress statements.* After his arrest, at approximately 2 A.M., the defendant was taken to the Springfield police department. Police interrogated him twice, once before, and once after, learning that Palmer had died. Both times the defendant signed a Miranda card and

---

[7]We need not address the defendant's claim that the jury pool selection in Hampden County was drawn by discriminatory means. That issue remains open to the defendant at the time of a new trial.

made a statement. As to both statements, the defendant argues that the statements were not voluntary beyond a reasonable doubt.[8] The defendant relies on the following facts, conceded by the police: He was seventeen years old, had been drinking, had been isolated for over four hours without food or sleep, and was falsely told by the police that he had been charged with stabbing Palmer. When he gave his second statement, he had been handcuffed in a room for an additional four hours, alone and with no food or sleep.

" 'In reviewing a . . . judge's determination that a voluntary waiver was made, the judge's subsidiary findings will not be disturbed, if they are warranted by the evidence, and his resolution of conflicting testimony will be accepted.' Although the judge's ultimate findings are open for review, 'a finding of voluntary waiver is "entitled to substantial deference by this court." ' " (Citations omitted.) *Commonwealth v. Tavares*, 385 Mass. 140, 144-145, cert. denied, 457 U.S. 1137 (1982). There was sufficient evidence to support the judge's finding that the defendant's statements were voluntary.[9] The defendant read a portion of the Miranda cards out loud, signed them both, and appeared rational and coherent to the interrogating officers. By his own testimony, he had

---

[8]The defendant also asks us to create a new rule of constitutional or common law requiring electronic recording of custodial interrogations. In making this request, the defendant refers us to a decision of the Supreme Court of Alaska, *Stephan* v. *State*, 711 P.2d 1156 (Alaska 1985), in which that court held that the due process clause of the Alaska Constitution requires custodial interrogations to be recorded when feasible. We believe that the electronic recording of interrogations would, in many cases, be a helpful tool in evaluating the voluntariness of confessions. Defendants, prosecutors, and courts spend an enormous amount of time and effort trying to determine precisely what transpires during custodial interrogations, and all would be benefited in some way by a complete electronic recording.

Although a rule requiring such recordings would have much to recommend it, we are unwilling to say at this time that the Massachusetts Declaration of Rights or the United States Constitution mandates such a rule. Likewise, we are not inclined to create a common law rule requiring electronic recording of interrogations.

[9]The judge who made this ruling was not the trial judge. We have had the benefit of his written findings as well as the transcript of the hearing on the motion to suppress.

consumed enough liquor earlier in the evening to feel its effects but he did not feel intoxicated at the time of interrogation. We see no reason to disturb the judge's findings.

The defendant further argues that his second statement to the police, in which he stated that he had stabbed the victim, should have been suppressed because it was obtained after the hour when overnight arrestees are usually taken to the District Court for arraignment and appointment of counsel. This delay, he argues, was a deliberate attempt by the police to interrogate the defendant a second time without the assistance of counsel. See *Commonwealth* v. *Cote*, 386 Mass. 354, 359-361 (1982). The defendant relies on "the dictates of common sense" to impute this motive to the police. As the motion judge found, the police did not know until about 7:30 A.M. that the victim had died, and that they were then involved with a homicide. The judge held that "[a]rraignment of the defendant in the late morning of the day of his arrest was warranted and timely under the circumstances." With this statement, the judge implicitly found that the police had not delayed intentionally the defendant's arraignment. The record supports the judge's finding, and we see no reason to disturb it.[10]

3. *Sufficiency of the evidence.* The defendant argues that the evidence before the grand jury was insufficient to support an indictment for murder and insufficient at trial to support a conviction of murder or the two convictions of assault and battery by means of a dangerous weapon. Although the evidence is far from overwhelming, we do not believe that the judge erred either in denying the motion to dismiss the murder indictment or in denying the motion for required findings of not guilty on the murder and assault and battery indictments.

---

[10]We further note that the defendant twice waived his rights to have an attorney present and to remain silent, and that these waivers were found to be voluntary. Contrast *Brewer* v. *Williams*, 430 U.S. 387 (1977) (where defendant had asserted right to counsel, police's deliberate delay in providing counsel impermissible).

a. *The defendant's motion to dismiss the murder indictment.* To withstand a motion to dismiss an indictment, the Commonwealth must present enough evidence to establish probable cause to believe that the defendant committed the crime charged. *Commonwealth* v. *Beldotti*, 409 Mass. 553, 554-555 (1991). *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). The grand jury heard evidence, including the defendant's own statement, that the defendant used a deadly weapon against an unarmed victim, stabbing him in the stomach area. There was probable cause to charge the defendant with murder in the first degree.

b. *The defendant's motion for required finding of not guilty on charge of murder in the first degree.* The defendant argues that the judge erred in denying his motion for a required finding of not guilty on the charge of murder in the first degree. Looking at the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), we believe that a rational finder of fact could conclude, beyond a reasonable doubt, that the defendant stabbed the victim with deliberate premeditation. "[W]here the purpose is resolved upon and the mind determined to do it before the blow is struck, then it is, within the meaning of the law, deliberately premeditated malice aforethought." *Commonwealth* v. *Blaikie*, 375 Mass. 601, 605 (1978), quoting *Commonwealth* v. *Tucker*, 189 Mass. 457, 494 (1905). The Commonwealth presented evidence that the defendant was seen fighting with the victim and that the defendant had admitted taking the knife from one of his friends and sticking the knife into the victim's stomach. The Commonwealth also presented evidence that, earlier in the evening of the incident, the defendant and his friends had passed around the weapon, examining it. We cannot say that as matter of law the evidence admitted at trial was insufficient to send the issue to the jury or to warrant the verdict of guilty.

c. *The defendant's motion for required finding of not guilty of assault and battery by means of a dangerous weapon.* The defendant argues that the judge erred in deny-

ing his motion for a required finding of not guilty on the charge that he committed an assault and battery by means of a dangerous weapon (the stick) on Kimberly Palfry, the victim's girl friend.[11] The defendant contends that the Commonwealth failed to present any evidence indicating that the defendant was the person who wielded the stick when Palfry was struck. There was no error. The Commonwealth presented ample evidence that the defendant was swinging the stick at some of the college students, including the victim and his girl friend. Numerous witnesses identified the assailant by his distinctive clothing. The defendant further claims that, at most, the evidence suggests an accidental striking of Palfry, because the assailant struck the automobile next to which she stood, and the stick made contact with her head as it ricocheted off the automobile.

The judge was correct in holding that the evidence was sufficient to establish that the defendant intentionally hit Palfry.

4. *Admissibility of the grand jury testimony of Laura Ferguson.* At trial, Laura Ferguson, one of the Commonwealth's witnesses, testified that she could not remember seeing what transpired between the defendant and the victim during the confrontation. She was shown her grand jury testimony, taken twenty-four days after the incident, but this did not refresh her recollection. The Commonwealth sought to introduce the grand jury testimony as substantive evidence. In the testimony, Ferguson asserted that she had seen the "guy with the dark jacket" (the defendant) push Palmer. The judge conducted a voir dire to determine whether the evidence could be admitted as a past recollection recorded. See *Commonwealth* v. *Bookman*, 386 Mass. 657, 663-665 (1982).[12]

---

[11]The defendant raises this argument only as to the charges pertaining to Palfry.

[12]Originally, the Commonwealth sought to introduce this evidence as a prior inconsistent statement pursuant to this court's decision in *Commonwealth* v. *Daye*, 393 Mass. 55, 65-75 (1984). The judge determined that the testimony in question did not satisfy the requirements of *Daye*, and

We have indicated previously that prior grand jury testimony may be admissible as a past recollection recorded. See *Commonwealth* v. *Daye*, 393 Mass. 55, 64-65 (1984). We believe, however, that the evidence in this case failed to satisfy the exacting standards we set forth in *Commonwealth* v. *Bookman, supra.* In that case, we held that, for grand jury testimony to be admissible in a criminal case as a past recollection recorded, there must be evidence that the witness saw, or adopted, the grand jury transcript as being accurate at or about the time of events. *Bookman, supra* at 664. Ferguson testified at the voir dire that her statement was true when she made it, but the voir dire occurred nearly one year after her appearance before the grand jury. Ferguson testified that this was the first occasion she had had to see the transcript from her grand jury testimony. She therefore did not "[see] or adopt[ ] the grand jury transcript as being accurate at or about the time of the events." *Bookman, Id.*

For the reasons stated earlier in this opinion, the judgments are reversed, the verdicts set aside, and the case remanded for a new trial.

*So ordered.*

---

suggested that the evidence might be admissible as a past recollection recorded. Trial counsel objected to the judge's assisting the Commonwealth in formulating a basis for admitting its evidence. We need not address this concern, however, because of our conclusion that the evidence ought not to have been admitted.