736 A.2d 325

Gary BAYNOR

v.

STATE of Maryland.

No. 145, Sept. Term, 1998.

Court of Appeals of Maryland.

Aug. 31, 1999.

Julia Doyle Bernhardt, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and ROBERT L. KARWACKI (retired, specially assigned), JJ.

RODOWSKY, Judge.

The petitioner, Gary Baynor (Baynor), here seeks reversal of his conviction for murder and other offenses, contending that the State failed to furnish discoverable information concerning Baynor's confession and that the trial court abused its discretion in circumscribing, both at the suppression hearing and at Baynor's jury trial, the defense examination of the detectives who obtained the confession.[1]

---

1.  Under Maryland non-constitutional law there is a two tiered approach to determining the voluntariness of a confession.

    "The trial court makes the threshold voluntariness determination, a mixed question of law and fact. Examining the totality of the circumstances, it assesses whether the confession was voluntarily made. If the trial court determines that the statement was not made voluntarily, it will declare it inadmissible. That completely resolves the issue; it never becomes one for the jury. If, on the other hand, the court finds the statement voluntary, it will admit it and its voluntariness then becomes an issue which the jury must ultimately resolve.

    "The jury's voluntariness determination also requires consideration of the totality of the circumstances surrounding the making of the statement. If it finds the statement to have been voluntarily made, it considers it along with the other evidence in the case in resolving the merits. If, however, it decides that the statement was not voluntary, it disregards the statement.

    "When the confession is challenged, both at the threshold, before the trial court, and, ultimately, before the jury, the burden is on the State to prove its voluntariness; it is the 'government [which] shoulders the responsibility of showing affirmatively that the inculpatory statement was freely and voluntarily made and thus was the product of neither a promise nor a threat.' *Hillard* [*v. State*, 286 Md. 145, 151, 406 A.2d 415, 418–19 (1979)]. Maryland, like the majority of the states, holds that the State's threshold burden is to establish the voluntariness of the confession by a preponderance of the evidence. The State's ultimate burden, however, is to prove voluntariness to the jury, beyond a reasonable doubt."

On the evening of February 1, 1996, Dion Williams (Williams) and Marvin Nock (Nock) were shot while standing at the 3300 block of Edgewood Street in Baltimore City. Williams was struck four times and later died from a gunshot wound to his chest. Nock was struck three times, in his chest, hip, and foot, and survived.

After Nock was discharged from the hospital, he assisted homicide detectives from the Baltimore City Police Department in preparing a composite of two shooting suspects. As a result of their investigation the homicide detectives ultimately were able to present Nock with an array of six photographs from which he identified Baynor as one of the shooters.

On September 26, 1996, Baynor, then nineteen years old, was arrested on charges of death-eligible, first degree murder, attempted first degree murder, assault with intent to murder, and the use of a handgun in the commission of a crime of violence. He was interviewed about noon that day by Homicide Detectives Michael Glenn and Wayne Jones in a room in the Homicide Unit at the Police Headquarters. Baynor asked why he was brought to the Homicide Unit, and Detective Glenn told him that he was charged with murder. Baynor then asked what penalty could he receive for murder, and Detective Glenn responded that he could receive either life imprisonment or the death penalty.[2]

---

*Hof v. State*, 337 Md. 581, 605–06, 655 A.2d 370, 382 (1995) (citations omitted).

2. On examination by the defense at the suppression hearing, Detective Glenn gave two versions of this statement. The first statement was as follows:

"Q. It's true there was a question posed to you by my client in a hypothetical fashion, isn't that correct?
"A. Your client asked me what he can receive for this crime.
"Q. And, what did you answer?
"A. He can be put to death summarily or life."

The second statement was as follows:

"A. ... When your client was brought over to Baltimore City Police Department Homicide Unit he was—he asked why he was brought over. I told him for a homicide. He was under arrest for a homicide. He asked me what he could receive for a homicide and I

At 12:41 p.m. Baynor was taken to be photographed. Between 12:48 and 12:58 p.m. the detectives obtained Baynor's identifying information. Following a brief recess, Detectives Glenn and Jones advised Baynor of his *Miranda* rights from 1:10 to 1:28 p.m. With the aid of an explanation of rights form, the detectives advised Baynor that: (1) he had the absolute right to remain silent; (2) anything he said or wrote may be used against him in a court of law; (3) he had the right to talk to a lawyer at any time; (4) he had a right to have a lawyer appointed for him if he wanted one and could not afford to hire one; and (5) even if he agreed to answer questions he could stop at any time and request a lawyer and no further questions would be asked. At 1:28 p.m. Baynor completed the form and acknowledged that he fully understood his rights and that he was freely and voluntarily willing to answer questions without having an attorney present. The interview began at 1:28 p.m. and concluded at 3:21 p.m. with an audio tape recorded statement that began at 3:12 p.m. In the recorded statement Baynor admitted shooting at Williams and Nock. Specifically, Baynor stated that he and a friend had planned to rob Williams and Nock, but then either Williams or Nock pulled out a gun and began shooting.[3]

The transcription of Baynor's recorded statement is seven and one quarter letter size pages. The first two pages are a point by point reconfirmation by Baynor of his written waiver of rights. The inculpatory section of that transcript reads as follows:

"GLENN: Okay. Mr. Baynor we're here in reference to the uh, homicide of Dion Williams which occurred on the first of February, 1996 at approximately 2158 hours. Can you tell me what happened ... ?

"BAYNOR: Well I got a hack on Edmondson Avenue and I went to go pick up a friend of mines and the hack had

---

said under the State of Maryland he could receive life or the death penalty. That was it, sir."

**3.** Insofar as the record discloses, Baynor's co-principal has never been identified.

took us to uh, Edgewood and Liberty Heights. So we went up there to make a robbery to uh, get a friend of mine out of jail which his name is . . . I can tell his name?

"GLENN: Go ahead and say his name sir.

"BAYNOR: His name is uh, Billy Lowery and um, we went . . . to go up there to uh, you know make a robbery to get him out of jail and when we get up there, we gets around the corner and a friend of mine pull a gun out and uh tells him, he say kicks it out. And the kid pulled out a gun and started shooting and we shoot back. So after that we ran. I ran one way he ran the other way. I gets on, I don't know the street but I gets on Garrison and he meets me on Garrison also and he calls his sister and his sister come get us and she drops me off on 13 South Carey Street and he goes about his business. . . . And after that we just left and when . . . Billy get home I give him the gun back. And uh, that's when everything happens.

"JONES: When you say everything happen, what happened to Billy after you gave him the gun back?

"BAYNOR: What happened to Billy? He gets locked up for the handgun.

. . . .

"JONES: Okay. And . . . what type of weapon did you have?

"BAYNOR: A nine millimeter, sir.

"JONES: What color was it, black or silver?

"BAYNOR: Black.

"JONES: How many shots did you fire during the incident?

"BAYNOR: One or two shots.

"JONES: How far away were you standing from the individual that you were . . . attempting, you and this partner?

"BAYNOR: . . . [A]cross the street.—It's like a cross. He was on one side and I was on the other side.

"JONES: In distance, approximately how far away?

"BAYNOR: It's about 50 feet.

. . . .

"GLENN: Do you know how many shots [your partner] fired?

"BAYNOR: Uh, it was a lot sir.

"GLENN: Do you know how many shots the victim fired?

"BAYNOR: The victim shot . . . he shot like once . . . once or twice.

. . . .

"JONES: Do you know what if anything was taken from the victim?

"BAYNOR: Some money sir.

"JONES: Do you know how much?

"BAYNOR: No I don't sir.

"JONES: Did you get any money?

. . . ,

"BAYNOR: About 20, 30, 40 dollars."

Baynor was indicted, and the first appearance of his counsel was on December 11, 1996. That day, the State disclosed that Baynor had made a taped statement, and the tape and a transcript of it were made available to the defense.

In January 1997, Baynor requested that the State, pursuant to Maryland Rule 4–263, furnish to him, *inter alia*, "any relevant material or information regarding the acquisition of statements made by the defendant," and the substance of each oral statement made by Baynor to a State agent that the State intended to use at hearing or trial.

During a pretrial hearing held on September 24, 25, and 26, 1997, Baynor moved to suppress the nine-minute recorded statement. Baynor alleged that during the interrogation he initially denied involvement in the shooting. The defense position was that "the [inculpatory] statement is not voluntary, that there were promises or inducements or suggestions made by the police officer to compel [Baynor] to change his statement." Baynor also argued that the recorded statement must be suppressed because the defense was entitled to a copy of his unrecorded exculpatory statements under Maryland Rule

4–263(b)(2)(B) and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In essence, Baynor argued that, without a report of the substance of the exculpatory oral statements, the hearing court and the trial jury could not properly assess the voluntariness of the recorded inculpatory statement.

Detectives Glenn and Jones and the defendant were examined by the defense at the suppression hearing. The court denied the motion to suppress, finding that "the State has satisfied its burden of proof that the statements made by the Defendant were made completely voluntarily and that they were made with appropriate advice as to his right to speak or not to speak."

The case was tried before a jury over four days in October 1997. On October 9, the jury returned its verdict against Baynor, finding him guilty of the second degree murder of Williams, the attempted second degree murder of Nock, two counts of the use of a handgun in the commission of a crime of violence, and two counts of unlawful possession of a handgun. On December 18, 1997, the circuit court sentenced Baynor to a total of one hundred years incarceration.

Baynor appealed to the Court of Special Appeals which affirmed in an unreported opinion. We granted Baynor's petition for a writ of certiorari. The following questions are presented for review:

"1. Whether a criminal defendant [A] is entitled to pretrial disclosure of the entire circumstances of an interrogation, including exculpatory statements, and [B] is entitled, at a hearing on a motion to suppress a statement as involuntary, to adduce evidence of the same where the state seeks to introduce a statement that resulted from that interrogation.

"2. Whether, at trial, a criminal defendant is entitled to place before the jury, as evidence relevant to voluntariness of a confession, a complete portrayal of the nature and circumstances of the interrogation, including evidence that a police officer told him at the beginning of the interrogation

that he could be 'put summarily to death' for murder and that he gave several exculpatory statements before confessing."

We shall address issue 1.A in Part I, *infra*, and issues 1.B and 2 in Part II, *infra*.

## I

Baynor initially relies on Maryland Rule 4–263 in arguing that he was entitled to pretrial disclosure of "the entire circumstances" of his statement, including exculpatory statements.

Rule 4–263 provides in relevant part:

"(a) *Disclosure without request.* Without the necessity of a request, the State's Attorney shall furnish to the defendant:

"(1) Any material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged;

"(2) Any *relevant* material or information regarding: (A) specific searches and seizures, wire taps or eavesdropping, (B) the acquisition of statements made by the defendant to a State agent that the State intends to use at a hearing or trial, and (C) pretrial identification of the defendant by a witness for the State."

(Emphasis added).

█ Subsection (a)(2)(B) of this rule derives from former Rule 741 a 2(b), which was created in the 1977 revisions to the Criminal Causes title of the Maryland Rules.[4] "[T]he purpose of Rule 741 a 2 is to force the defendant to file certain motions before trial, including a motion to suppress an unlawfully

---

4. Maryland Rule 741 a 2(b) provided: "Without the necessity of a request by the defendant, the State's Attorney shall furnish to the defendant ... [a]ny relevant material or information regarding ... the acquisition of statements made by the defendant...." No similar provision existed in the Rules prior to 1977. *See* former Maryland Rule 728.

obtained statement." *White v. State*, 300 Md. 719, 734, 481 A.2d 201, 208 (1984), *cert. denied*, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985). Under this subsection

> "material or information dealing with the circumstances in which a statement was obtained from the accused by a State agent was to be automatically produced by the State, in order to trigger the running of the time for filing a motion to suppress, while the statement made to the State agent was producible only on request by the accused."

*Id.* at 736, 481 A.2d at 209. *Accord Bailey v. State*, 303 Md. 650, 655, 496 A.2d 665, 667 (1985) ("Our prior cases have explained that . . . the automatic disclosure required by [Rule 741 a] is designed to force the accused to file any motions to suppress in advance of trial on the merits."). Thus, under Rule 4–263(a)(2)(B) the State must disclose to the defense the circumstances by which the State obtained a statement from the defendant, if the State intends to use it at trial.

There are at least three limitations on the State's obligation under Rule 4–263(a)(2).

> "First, Md. R. [4–263(a)(2)] is concerned only with the subjects specified in parts [ (A), (B), and (C) ]. Second, Md. R. [4–263(g)] limits that which is discoverable under Md. R. [4–263(a)(2)] to 'material and information in the possession or control of [the State's Attorney, of] members of his staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office.' Third, the information must be relevant. This is the same limitation which courts traditionally apply and which turns on the legal issues under the facts and circumstances of the case."

*Warrick v. State*, 302 Md. 162, 170–71, 486 A.2d 189, 193 (1985). Additionally, the State's Attorney's disclosure under this rule "need only be a simple but fair statement of the relevant information." *Id.* at 171, 486 A.2d at 193.

In this case the statement that the State intended to use at hearing or trial was the recorded inculpatory statement.

Obviously the State did not intend to use the exculpatory statements initially given by Baynor, which the police did not believe, and the police had recorded only the inculpatory statement that the State did intend to use. The "relevant material or information regarding ... the acquisition" of that statement, within the meaning of Rule 4–263(a)(2)(B), was sufficiently reflected in the copy of the recorded statement furnished to Baynor. It disclosed when and where the statement was taken and the persons present when the statement was taken. It contained a recitation of Baynor's waiver of rights, including the right to counsel. The content of exculpatory statements that Baynor had recanted simply would not be relevant to the statement that the State actually intended to use. Although disclosure of "relevant material or information regarding ... the acquisition" of a statement that the State intends to use would include disclosure of any threats or inducements made to the person giving the statement, the absence of any such information from the discovery furnished by the State in the instant matter meant that the State agents did not consider that there had been any threats or inducements.

Baynor, however, in effect argues that the required disclosure must be of the entire interrogation; otherwise, it would not be possible for a trier of fact to consider the totality of the circumstances on the issue of the voluntariness. At oral argument in this Court, when asked what information was not disclosed by the State, Baynor's counsel replied, "The questions that were asked in the interrogation of the defendant before the tape recording was turned on, his responses thereto, and the manner in which they were asked." The language of Rule 4–263(a)(2)(B), however, does not support so broad a reading, and in adopting the Rule this Court did not intend to place so great a burden on the State. There is no requirement that the State disclose essentially a verbatim account of a custodial interrogation that ultimately results in an oral inculpatory statement. *Compare* Rule 4–263(b)(2)(B) (providing that if the State intends to use an oral statement made by the defendant at a hearing or trial, it must disclose upon

request "the *substance* of each oral statement and a copy of all reports of each oral statement," but not the questions asked, the manner in which they were asked, and the responses (emphasis added)).

Baynor's argument intimates that all custodial interrogations must be recorded for a trier of fact to be able to determine the totality of the circumstances related to the voluntariness of a confession. A majority of state courts have rejected a requirement that custodial interrogations be recorded for a confession to be considered voluntary. *See, e.g., People v. Holt*, 15 Cal.4th 619, 663, 63 Cal.Rptr.2d 782, 811, 937 P.2d 213, 242 (rejecting the defendant's argument that tape recording of statement made during a custodial interrogation is required to ensure fundamental fairness because "a confession may not be the voluntary 'product of a rational intellect and a free will,' and the need to test the voluntariness of a confession on the basis of 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation' ") (citation omitted), *cert. denied*, —— U.S. ——, 118 S.Ct. 606, 139 L.Ed.2d 493 (1997); *People v. Raibon*, 843 P.2d 46, 48 (Colo.Ct.App.1992) (rejecting the defendant's argument "that the investigators' failure to videotape or audiotape his initial interview violated his rights under the due process clause of the Colorado Constitution"); *Coleman v. State*, 189 Ga.App. 366, 366, 375 S.E.2d 663, 664 (1988) (rejecting the defendant's argument "that the court erred in admitting into evidence a custodial statement, urging that the failure to record the statement electronically violated the constitutional guarantees of due process, right to counsel, right to a fair trial, and right not to incriminate oneself"); *State v. Kekona*, 77 Hawai'i 403, 407–08, 886 P.2d 740, 744–45 (1994) (rejecting the defendant's argument "that in order for the State to meet its burden of proving that he validly waived his constitutional rights, the police were required to tape record all of his oral statements"); *State v. Rhoades*, 119 Idaho 594, 601, 809 P.2d 455, 462 (1991) ("[W]e cannot accept the contention that in order to be admissible, statements made in custody must be tape recorded by the police."); *State v.*

*Buzzell,* 617 A.2d 1016, 1018 (Me.1992) (rejecting the defendant's argument "that the due process clause of [the Maine Constitution] requires electronic recording of custodial interrogation"); *Commonwealth v. Fryar,* 414 Mass. 732, 742 n. 8, 610 N.E.2d 903, 909 n. 8 (1993) (stating that neither the common law, the Massachusetts Declaration of Rights, nor the United States Constitution requires electronic recording of custodial interrogations); *Williams v. State,* 522 So.2d 201, 208 (Miss.1988) (rejecting the defendant's argument "that statements made during custodial interrogation must be tape recorded to be admissible"); *Jimenez v. State,* 105 Nev. 337, 341, 775 P.2d 694, 697 (1989) (per curiam) (declining the defendant's "invitation that we adopt a rule requiring the tape recording of defendants' statements"); *State v. James,* 858 P.2d 1012, 1017 (Utah Ct.App.1993) (rejecting the defendant's argument "that the detectives' failure to record the interrogation verbatim violated his constitutional guarantee of due process under both the federal and state constitutions"); *State v. Gorton,* 149 Vt. 602, 606, 548 A.2d 419, 421 (1988) (rejecting the defendant's argument that "[a]bsent a recording of defendant's statements and absent a finding that a tape recording was not feasible, . . . the admission of defendant's statements [is] reversible error"); *State v. Spurgeon,* 63 Wash.App. 503, 508–09, 820 P.2d 960, 963 (1991) (holding that a failure to tape record a custodial interrogation does not violate a criminal defendant's due process rights under the state constitution), *review denied,* 118 Wash.2d 1024, 827 P.2d 1393 (1992).

*But see Stephan v. State,* 711 P.2d 1156, 1159 (Alaska 1985) (holding that under the due process clause of the state constitution the custodial interrogation of a suspect must be electronically recorded when recording is feasible); *State v. Scales,* 518 N.W.2d 587, 592 (Minn.1994) (holding that "in the exercise of our supervisory power to insure the fair administration of justice, . . . all custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs at a place of detention"); *see also* Texas Code of Criminal Procedure, art.

38.22, § 3 (1979, 1999 Cum.Supp.) (oral statements made during a custodial interrogation are admissible only if electronically recorded).

■ Moreover, federal constitutional law does not require a state to preserve evidence for use by a criminal defendant. *See Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law").

■ While most courts acknowledge the usefulness of a rule requiring the police to electronically record all statements obtained during custodial interrogations, courts are generally reluctant to impose such a rule on police departments without legislative sanction. As the Supreme Court of Vermont explained: "The most appropriate means of prescribing rules to augment citizens' due process rights is through legislation. In the absence of legislation, we do not believe it appropriate to require, by judicial fiat, that all statements taken of a person in custody be tape-recorded." *Gorton,* 149 Vt. at 606, 548 A.2d at 422 (citation omitted).

For the reasons stated above, we hold that there was no violation by the State of Rule 4–263.

## II

Baynor next argues that he was deprived, at the suppression hearing and at trial, of his entitlement to adduce evidence of the entire circumstances of his interrogation, including, at trial, evidence that the police told him he could summarily be put to death. The short answer to these contentions is that Baynor testified at the suppression hearing, thus adducing evidence of all of the circumstances of the interrogation that he considered to be relevant, and that Baynor had the right and opportunity to do so at trial, but he chose not to exercise that right. At the suppression hearing Baynor's specific ground of involuntariness was the alleged inducement that, by

confessing, he could avoid the death penalty ("[Detective Glenn] was telling me like I could avoid [the death penalty] as far as copping out, to copping out to taking the charge of robbery."). The trial court did not believe this evidence and Baynor elected not to present it to the jury. Thus, although Baynor argued involuntariness to the jury, he had no evidence at trial to support the theory of involuntariness. *See Hof v. State,* 337 Md. 581, 617, 655 A.2d 370, 388 (1995) ("[W]e now hold that to merit a jury instruction on voluntariness ... the issue must be generated before the jury ... [and] that there be evidence *at trial* from which the trier of fact could conclude that the confession was involuntary.").

Faced on appeal with the credibility hurdle at the suppression hearing and the sufficiency of the evidence hurdle at trial, Baynor's argument to us is, in essence, that the trial court erroneously restricted his examination of the detectives. Examination of the detectives at trial, as well as at the suppression hearing, elicited evidence of Baynor's initial protestations of innocence, the fact that the detectives informed Baynor that he could receive the death penalty if convicted, the fact that Baynor gave conflicting accounts of the shooting, the fact that only the final nine minutes of the interrogation were tape recorded, and the fact that Detective Glenn's handwritten notes were not a complete verbatim account of all of Baynor's statements. Additionally, during opening statement and closing argument to the jury, the defense commented on the non-recorded portions of the interrogation including the fact that the State told Baynor that he could receive the death penalty if convicted. Thus, contrary to Baynor's argument, the court and the jury were able to consider all of the existing evidence, written and testimonial, regarding the circumstances of the acquisition of the nine-minute recorded statement in the determination of the totality of the circumstances on the issue of the voluntariness of the statement.

In support of his argument directed to the suppression hearing, Baynor points only to a passage in the defense examination of Detective Jones, who was the second of the two witnesses for the State. At hearings on various defense

motions on September 24, 1997, the examination by defense counsel of Detective Glenn, the primary investigator of the homicide, concerning the interrogation of Baynor covers fifty-one pages, during which the detective denied that he had promised Baynor "certain treatment if [Baynor] admitted to certain conduct." Detective Jones testified the next day under defense examination covering fifteen pages. In this Court, Baynor's principal objection directed to that hearing concerns the following passage:

[Question from counsel for Baynor to Detective Jones]

"Q. Is it true that he was asked whether or not he shot Dion Williams or Marvin Nock?

"THE COURT: Well, again and this is the third time I believe I've said this, you're getting into the contents of what the Defendant might have said.

"[DEFENSE COUNSEL]: Correct, Your Honor. If I can just explain why, Your Honor, it seems to me I need to establish—

"THE COURT: This is not a discovery proceeding.

"[DEFENSE COUNSEL]: I recognize that. Actually, I'm discovering nothing, so you can be confident—

"THE COURT: I think you're attempting to discover.

"[DEFENSE COUNSEL]: Well, Your Honor, respectfully I'm trying to establish that my client denied involvement.

"THE COURT: But, that's just it. We're not here to establish whether he denied any involvement or acknowledged involvement. We're here to determine that whatever he may have said was it done voluntarily or not.

"[DEFENSE COUNSEL]: Well, Your Honor, there must be something that changed my client's mind in the statement that I'm innocent to the statement that I'm not innocent and—

"THE COURT: All right. Well, we have established yesterday afternoon that your client made different types of statements, inculpatory, exculpatory. The Detective cannot explain why your client may have given different versions of the incident. He can't explain why. Only your client can

explain why. He can only testify as to circumstances surrounding the statement and whatever he may have said was it voluntary or not voluntary. You have got to cut to the quick. If you have any reason to feel that whatever he may have said was not said voluntarily then let's get to that."

■ We see no abuse of discretion. As we said in *Hof,* 337 Md. at 619, 655 A.2d at 389, "[t]he critical focus in an involuntariness inquiry is the defendant's state of mind. Whether the defendant's incriminating statement was made voluntarily or involuntarily must depend upon that defendant's mental state at the time the statement was made." It is a fact question that is subjective in nature. *Id.* Consequently, the trial court was entirely correct in pointing out that Detective Jones could not explain why Baynor moved from protestations of innocence to the recorded statement.

■ It is true that the state of mind of the defendant may be proven circumstantially, by the acts, conduct, and words of the defendant. *Id.* In this case Baynor had ample opportunity at the suppression hearing to develop his acts, conduct, and words through the examination of Detective Glenn and through two prior efforts at Detective Jones before Baynor was cut off.

With respect to the trial, Baynor also argues, in essence, that the court erroneously limited his cross-examination of Detective Glenn. The argument begins with the undisputed facts that the portion of the interrogation of Baynor that culminated in his confession began at 1:28 p.m. on Thursday, September 26, 1996, and that the nine-minute tape recording of the oral confession began at 3:12 p.m. The only writings evidencing what transpired during the unrecorded period of the interrogation are the advice of rights form that was reviewed, initialed, and signed by Baynor and the five pages of longhand notes made by Detective Glenn.

Set forth below is the portion of the cross-examination of Detective Glenn on which Baynor relies, in which we have

interspersed our holdings on the evidentiary rulings by the trial court.

"Q. Did my client ever use the word murder in the one hour and fifty-one minutes of his statement to you that is not transcribed?

"[THE PROSECUTOR]: Objection. Request to approach.

"THE COURT: Don't give the reasons for the objection from the trial table. I will sustain the objection."

There was no error in this ruling. Baynor's legal characterization or conclusion with respect to his conduct is not material.

"Q. Detective, how is the jury to know what it is my client told you during that two hour period?

"[THE PROSECUTOR]: Objection.

"THE COURT: Sustained."

There is no error. The question is argumentative.

"Q. Is it true, Detective, that you didn't tape record the rights that you have told the jury about?

"A. The rights were asked on the statement itself, sir.

"Q. Do you have a copy of the statement itself?

"A. Yes, sir.

"Q. Would you please read to the jury where on the statement it is you direct the rights?

"A. Okay, sir. It starts off—okay, all right. How are you this afternoon, Mr. Baynor? Before we even spoke to you we showed you an explanation of rights form, is that correct, and Mr. Baynor said yes, sir.

"THE COURT: Well, we've gone over this in the Detective's testimony already. He doesn't have to read that again. What he's saying is, if I understand him correctly, that although it is not tape recorded the rights form is attached to the statement that was initialed and was signed by the Defendant himself. Is that what you're saying, Detective Glenn?

"THE WITNESS: That's correct, and in the middle of it again in the taped statement.

"THE COURT: Yeah, again, so that's what he's saying about the rights form.

"BY [DEFENSE COUNSEL]:

"Q. Detective, the explanation of rights form has a time 1:29 p.m., is that correct?

"A. I believe the time, sir, of 1:28 p.m.

"Q. Is it true, Detective, that the time of the tape is much later, an hour and a half later?

"A. Yes, sir, 3:12 in the afternoon.

"Q. And, is it true, Detective, that you had an interview with my client between the hours of 1:28 p.m. and the time of the taped statement at 3:12 p.m.?

"A. Yes, sir.

"Q. Is it true that you did not write down what my client told you?

"THE COURT: Well, that question has been asked already. You've already asked the question. Well, no, I'm sorry. Maybe not. He said he didn't tape record anything between those times, but now you're asking if he wrote down anything?

"[DEFENSE COUNSEL]: Correct, Your Honor.

"THE COURT: Is that correct? I'm sorry. Did you write down anything that was told to you by the Defendant during that time period, Detective Glenn?

"THE WITNESS: I don't know. I would have to see the notes myself, Your Honor.

"THE COURT: Yes, sir. I'm sorry.

"[DEFENSE COUNSEL]: Thank you, Your Honor."

Defense counsel then moved into a line of examination concerning Baynor's exposure to the death penalty.

"Q. Isn't it true that my client asked you why you had brought him down to the Baltimore City Police Department?

"A. Yes.

"Q. Isn't it true that you told him he was under arrest for murder?

"A. That's correct, sir.

"Q. Isn't it true that you told him that he was facing the death penalty?

"A. Your client asked me what's the ultimate charge or what could happen to him in reference to this and I told him under the State guidelines the death penalty is a possibility.

"Q. And, isn't it true that when you told him that he became visibly upset and nervous?

"[THE PROSECUTOR]: Objection.

"THE COURT: Sustained.

"BY [DEFENSE COUNSEL]:

"Q. Isn't it true that when you told him that he had a reaction?

"A. I don't recall one.

"THE COURT: No, he's not—that is too broad a concept, a reaction. I mean, he could have a reaction to being—he talked to him. So, the Detective can't answer that question.

"BY [DEFENSE COUNSEL]:

"Q. Isn't it true, Detective, that you noticed my client's appearance and demeanor change after you told him he was facing the death penalty?

"A. No, sir.

"Q. Isn't it true that he exhibited nervousness and that you testified that he exhibited nervousness on a prior occasion?

"[THE PROSECUTOR]: Objection.

"THE COURT: Sustained.

"BY [DEFENSE COUNSEL]:

"Q. You have testified about this on a prior occasion, is that correct?

"[THE PROSECUTOR]: Objection.

"THE COURT: Sustained."

Assuming that nervousness on the part of Baynor is relevant to voluntariness, the witness ultimately answered the question, but unfavorably to Baynor. Further, Baynor made no proffer of what the witness's prior testimony had been. Indeed, Baynor could have incorporated the prior testimony in a leading question, but did not do so.

"Q. Detective, did you ask my client his level of education?

"A. Yes, I did.

"Q. What did he tell you his level of education was?

"A. I believe it was Walbrook High School and he completed the eleventh grade.

"Q. Did you ask him whether or not he had ever before been told by a police officer that he was facing the death penalty?

"[THE PROSECUTOR]: Objection.

"THE COURT: Sustained.

"[THE PROSECUTOR]: Request to approach.

"THE COURT: Yes.

"[THE PROSECUTOR]: Thank you, Your Honor.

"[At the bench:]

"[THE PROSECUTOR]: Your Honor, I object to the repeated characterization of the Detective having said he was facing the death penalty. I think there is a distinction to be made.

"THE COURT: I will sustain the objection. It is not what the Detective—it's something the Detective testified he told the Defendant.

"[In open court:]

"THE COURT: The objection is sustained.

"BY [DEFENSE COUNSEL]:

"Q. Detective, did my client ask you in his own words what the maximum penalty he faced was?

"[THE PROSECUTOR]: Objection.

"THE COURT: Well, sustained. It has been asked and answered.

"BY [DEFENSE COUNSEL]:

"Q. Detective, how—exactly what exact—what exact words did you tell my client with respect to the death penalty?

"[THE PROSECUTOR]: Objection.

"THE COURT: Sustained. That's been asked and answered.

"BY [DEFENSE COUNSEL]:

"Q. Is it true, Detective, that you communicated to my client that the maximum penalty—

"THE COURT: I'm not going to allow that line of questioning. That line of questioning has been asked and answered.

"[DEFENSE COUNSEL]: May I approach, Your Honor.

"THE COURT: No, sir. Let's go on.

"BY [DEFENSE COUNSEL]:

"Q. Is it true, Detective, that your purpose in telling my client that he was facing the death penalty was only to inform him of the maximum penalty he was facing and for no other reason?

"A. The purpose was to tell him the truth."

In apparent reliance on the foregoing passage, Baynor contends to us that he was prevented from developing at trial that portion of the testimony of Detective Glenn at the suppression hearing when the latter said that Baynor could be "summarily" put to death or be imprisoned for life. *See* footnote 2, *supra.*

Baynor says that this was false information about the potential penalty which thereby renders his confession involuntary as a matter of law. We do not reach that legal question because Baynor has not shown that he was precluded by the trial court from establishing a factual basis for advancing that argument. As previously noted, Baynor properly could have so testified, if that were his recollection of the

conversation.[5]   At the trial before the jury Baynor never put the question squarely to Glenn about summary capital punishment.   Baynor never put a leading question to Glenn that he had in fact so testified.   Further, had Baynor considered the matter important, he could have obtained for use at trial a transcript of that portion of Glenn's testimony at the suppression hearing, but Baynor did not do so.   Had Baynor confronted Glenn with the transcript of his testimony it may or may not have produced an answer favorable to Baynor.   In any event, the trial court did not prevent Baynor from attempting to elicit that answer.

Consequently, we affirm.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.   COSTS TO BE PAID BY THE PETITIONER, GARY BAYNOR.*

BELL, C.J., and ELDRIDGE and RAKER, JJ., dissent.

RAKER, Judge, dissenting:

A critical issue at Petitioner's trial was the voluntariness of his confession to the police.   Petitioner wanted the jury to know that before he confessed, the police told him that as a penalty for murder, he could be "put to death summarily or life."   The jury never learned that the detective falsely informed Petitioner that he was subject to being put to death summarily for the murder of Dion Williams, that he maintained his innocence for some period of time, and that he claimed that the circumstances of the interrogation caused him to admit the shooting.   I would hold that the court abused its discretion at the jury trial of Petitioner in limiting the defense examination of the detective who obtained the confession.

Evidence showing that a defendant was told falsely by detectives that he faced a "summary" execution is appropriately included in the totality of the circumstances analysis that a

---

5.  Baynor's description at the suppression hearing of the conversation with Detective Glenn about the death penalty did not include Detective Glenn's using the term "summarily," and Baynor's counsel did not make the "false information" argument to the court at that hearing.

jury employs in arriving at a determination of voluntariness. *See, e.g., Green v. State,* 91 Md.App. 790, 605 A.2d 1001 (1992) (holding statement involuntary where minor falsely told that he was subject to death penalty). A jury considers the question of voluntariness in the light of all the facts and circumstances of the case. *Brittingham v. State,* 306 Md. 654, 511 A.2d 45 (1986). By repeatedly sustaining the State's objections during the cross-examination of Detective Glenn, the trial court prevented the jury from hearing evidence that Baynor was told that he could be "put to death summarily."

Courts around the country have held that the giving of false advice as to the possible penalties is a factor affecting the voluntariness determination. *See, e.g., United States v. Duvall,* 537 F.2d 15, 24–25 (2d Cir.1976) (holding statement involuntary where prosecutor stated that defendant faced 100 years, under circumstances where no prosecutor would seek nor judge impose such a sentence); *People v. Nicholas,* 112 Cal.App.3d 249, 169 Cal.Rptr. 497, 506 (1980) (holding statement involuntary where detectives falsely implied to defendant that he faced death penalty where it did not have retroactive effect and did not apply to his case); *State v. Nelson,* 63 N.M. 428, 321 P.2d 202, 206–207 (1958) (holding statement involuntary where defendant was falsely told he did not face death penalty if he confessed). In addition, other courts have held that the threat of harsh punishment is an important factor in assessing voluntariness. *See, e.g., People v. Hinds,* 154 Cal. App.3d 222, 201 Cal.Rptr. 104, 114 (1984) (holding statement involuntary where appellant was told that if he did not tell the truth and explain to them mitigating factors, he might get the death penalty).

I disagree with the majority's conclusion that Petitioner was not prejudiced because he testified at the suppression hearing, thus adducing evidence of all the circumstances of the interrogation that he considered relevant and that he had the right and opportunity to do so at trial, but chose not to exercise that right. Maj. op. at 740. He was not required to testify at the trial to bring the detective's false statement regarding the death penalty before the jury. At the suppression hearing,

the detective testified that Petitioner asked him what he could receive for the crime; the detective conceded that he told Petitioner: "He can be put to death summarily or life." Petitioner had the unfettered right to elicit this testimony on cross-examination of the detective.

The majority concludes that Petitioner has not shown that he was precluded by the trial court from presenting evidence that the detective gave him false information about the potential penalty. Maj. op. at 748. Somehow the majority concludes that Baynor never put the question squarely to the detective about summary capital punishment. *Id.* In support of its conclusion that Petitioner cannot now complain of any alleged restriction on the cross-examination, the majority notes that he never put forth a leading question incorporating that evidence, and that he never obtained for use at trial a transcript of that portion of the detective's suppression hearing testimony. While a leading question or impeachment with prior testimony may have been a wise strategy, it is not required trial practice. Moreover, the transcript supports Petitioner's position. The detective was specifically asked, "What exact words did you tell my client with respect to the death penalty?" An objection to that question was sustained improperly by the trial court, on the ground that the question had been asked and answered. In fact, it had never been answered. In this regard, all the jury knew regarding the death penalty was that the detective mentioned that the death penalty was a possibility. The trial court erroneously restricted Petitioner's examination of the detective, improperly limiting the ability of the jury to consider the totality of the circumstances in assessing the voluntariness of the confession.

In order to properly assess the voluntariness of Baynor's confession, the jury should have been allowed to consider evidence that the detective told him that he faced being put to death summarily. Because the jury never heard this critical information, Petitioner was denied under Maryland nonconstitutional law his right to place before the jury evidence of the complete circumstances of the police interrogation. The judg-

ment should be reversed and the case remanded for a new trial.

Chief Judge BELL and Judge ELDRIDGE have authorized me to state that they join in the views expressed in this dissenting opinion.